250 Hudson Street Corporation v. Commissioner.
250 Hudson St. Corp. v. Commissioner
Docket No. 7468.
United States Tax Court
1946 Tax Ct. Memo LEXIS 112; 5 T.C.M. (CCH) 722; T.C.M. (RIA) 46205; August 9, 1946
*112 Harold F. Noneman, Esq., 40 Wall St., New York 5, N. Y., for the petitioner. Conway Kitchen, Esq., for the respondent. LEMIRE Memorandum Findings of Fact and Opinion LEMIRE, Judge: Respondent determined deficiencies in petitioner's income and declared value excess-profits tax as follows: Declared
Value Excess-
Year
Income Tax
Profits Tax
1940
$ 9,080.48
$4,519.58
1941
12,122.81
4,216.90 The determination of excess profits tax for 1941 disclosed an overassessment of $2,220.36. The only questions in issue are whether respondent has correctly determined depreciation deductions on a building, and whether petitioner is entitled to deduct payments of interest on its outstanding debenture notes. Both questions apply to both taxable years. The case was submitted upon oral testimony and documentary evidence introduced by both parties. Issue I Findings of Fact. - Petitioner is a corporation, organized under the laws of the State of New York on July 9, 1928. Its returns were prepared on the accrual basis of accounting and were filed with the Collector of Internal Revenue for the Third District of New York. Petitioner is the owner *113 of an industrial building known as 250 Hudson Street. The building occupies one city block and consists of a basement, 14 floors and a penthouse. It was erected for petitioner in 1929 at a cost of $1,180,651.07. This amount includes building equipment. Detailed items of cost are recorded in petitioner's books of account. The books of account do not contain any apportionment of general costs between the building and its equipment but such a schedule was produced by expert testimony and is incorporated herein by reference. [1]
Petitioner's building was constructed of reinforced concrete according to a design sometimes described as the "mushroom type". The oldest comparable structure of this type was built about 1910. Similar designs are employed at the present time, an example of which is the World-Telegram building built in 1930. The framework of such structures is formed by reinforced concrete columns which splay out at the capitals and support horizontal slabs of reinforced concrete. The reinforcement is supplied by a web of steel rods. There is no skeleton of structural steel, except that on the lower floors the columns usually contain steel *114 cores in order to reduce the size of columns required to support the upper floors. In petitioner's building such cores were used between the first eight floors. The foundations of the building were originally designed to consist of concrete piles. Upon excavation, however, it was discovered that one-half of the building site lay in the bed of an old stream through which piles could not be driven. This half of the foundation was constructed on concrete forms of a type known as "spread footing"; the other half was built with concrete shell piling. The irregular construction of the foundation has caused a "shear" throughout the entire structure of the building. This movement has not shortened the life of the structural skeleton but it has caused damage to the veneer and ornamentation of the building. Projections from a limestone belt course and sill fell into the street within two or three years after the building was completed. It was necessary to remove, trim and polish the projections in order to avoid injury to the public. It was also necessary to repair and replace part of a brick veneer which had loosened on one side of the building. A four inch veneer of brick covers three sides *115 of the building above the first four floors and may have to be replaced within ten or twelve years due to the peculiarity of the building's construction. Petitioner's building was designed and constructed as a speculative type, to be sold if possible. Except for the structural skeleton and foundations, the building materials and equipment are of a class usually adapted to industrial use. The elevators are run by gears whereas first class elevator equipment is gearless. The costs of other elements, such as plumbing, heating, sprinklers, windows and sash, were held to a minimum. In general, the best of the cheapest class of materials and equipment was installed throughout the building. While essential repairs have been made to the roof, elevators, and windows, no major replacements have been made since the building was completed. This is in part due to the scarcity of materials during the war years. The sole alterations have consisted of the building of a transformer vault and additional toilet facilities. Petitioner is now faced with the necessity of replacing boilers, steam lines, plumbing, elevators, and the roof of its building. The present tenants of the building are the Board *116 of Transportation (of the City of New York), occupying ten floors, and the Bell Telephone Co., occupying the remaining floors as a laboratory. Both tenants have occupied the building since it was completed in 1929. The net income derived by petitioner from the building over a six year period, as shown on its tax returns before deduction for federal taxes, was as follows: 1936
$ 4,726.10 (loss)
1937
1,234.38 (loss)
1938
23,853.81
1939
23,876.00
1940
43,768.78
1941
56,687.71
The useful life of petitioner's building, including equipment, was 40 years as of the end of 1929; the remaining useful life as of the beginning of 1940 was 30 years. Opinion. - Respondent has accepted the cost basis of $1,180,651.07 given in the findings of fact. From such cost respondent has deducted 25 per cent representing annual depreciation at the rate of 2 1/2 per cent allowed for 10 years. The balance, or 75 per cent of the cost, has been determined to be exhaustible over a period of 56 2/3 years, which is the equivalent of a life of 66 2/3 years less the expired life of 10 years. On this basis the respondent disallowed depreciation in the amount of $13,889.90 for each of the *117 taxable years 1940 and 1941. Petitioner contests this determination and contends that the total useful life of its building is 40 years and that the remaining useful life from January 1, 1940, is 30 years. A great deal of testimony and argument in this proceeding have been devoted to the subject of reinforced concrete construction. Much of this has little bearing upon the real issue involved. In fact, petitioner's witness ascribed a life of 60 years to the concrete skeleton and foundation of the building. Petitioner's theory is, however, that the useful life of the entire building is to be measured by the average useful life of all its component elements, including building equipment. See Bulletin "F" (Revised January, 1942), page 16, which states: The extent to which the equipment of a building, such as heating, plumbing, electrical wiring and fixtures, elevators, and other improvements, must be replaced is an important factor in determining the over-all rate of depreciation to be applied to the building and its equipment. [2]
*118 Respondent contends that petitioner has not provided a basis for computing a composite rate of depreciation. He also contends that all of the component elements of the building were constructed of first class materials. The evidence in the case is to the contrary. Petitioner relies upon the testimony of its general contractor, or engineer of construction, who supervised the construction of the building and was responsible for approving all the bills of cost. He testified that the useful life of the building, including equipment, was 40 years from the date of its erection in 1929 and that the remaining useful life as of the beginning of 1940 was 30 years. He was a competent witness whose judgment was based upon an intimate knowledge of the building as well as upon his long experience in the construction business. In support of his opinion petitioner's witness produced an analysis of 18 component elements of the building. He estimated the useful life of each element and applied the resulting component rate of depreciation to the cost allocated by him to each element. This method is approved in Bulletin "F" (Revised January, 1942), page 6, for the computation of composite rates of *119 depreciation. By this method petitioner's witness estimated a total average useful life for the entire building of approximately 35 years. The analysis was not offered as evidence of cost but only as an allocation of general costs among the component elements of the building. Respondent challenges this testimony by an unusual argument. He contends that all of the testimony should be disregarded because the witness used the uncontested cost basis of the building which includes $15,000 attributable to demolition prior to construction, contrary to the principle of such cases as Robert B. Griffin, 17 B.T.A. 255, and Providence Journal Co. v. Broderick, 25 Fed. Supp. 943. This argument ignores the fact that the witness merely spread the sum of $15,000 on a proportionate basis over all the component elements of cost. The elimination of this amount from the cost basis would not change the result of his analysis. The respondent does not contest the cost basis as including the $15,000 demolition cost. In rebuttal to the testimony of petitioner's witness respondent offered the testimony of a witness who had had no experience in the construction of reinforced concrete *120 buildings, who was not aware of the irregular construction of the foundation of petitioner's building, and who was unfamiliar with the building equipment. Based on tables prepared by the Bureau of Internal Revenue, he testified that in his opinion the economic life, and the physical life, of the building was 56 2/3 years from January 1, 1940. In view of this witness's lack of knowledge of the building under consideration little weight can be given to his testimony. Upon consideration of all the evidence we have found that the remaining useful life of petitioner's building at the beginning of 1940 was 30 years. Issue II Findings of Fact. - Petitioner was organized by two brothers, Benjamin B. Davis and Robert H. Davis, Sr., for the purpose of erecting the building described hereinbefore. The land on which the building was erected was purchased by petitioner from B. B. Davis & Co., Inc., whose stock was owned in equal shares by the Davis brothers. It was originally intended that petitioner would give a mortgage for the full value of the land. However, petitioner was refused a building loan unless it held the land free and clear of lien. Payment for the land, then appraised at $750,000, *121 was consequently made by issuing petitioner's preferred stock in an amount equal to the appraised value. At the time of incorporation petitioner was authorized to issue 10,000 shares of 7 per cent cumulative preferred stock at $100 par value each and 1,000 shares of common stock without par value. On July 16, 1928, 7,500 shares of preferred stock were issued to B. B. Davis & Co., Inc., for the land, and three shares of common stock were issued, 1 1/2 shares to each of the Davis brothers for a nominal consideration. These shares represented the total outstanding stock of petitioner. All preferred and common stock certificates were endorsed with extracts from petitioner's articles of incorporation which provided that the preferred stock (1) entitled its holders to 7 per cent cumulative dividends, payable semi-annually out of net earnings;(2) was subject to redemption at any time at the option of petitioner at its par value; (3) was vested with exclusive voting rights, and (4) had preference over the common stock on dissolution. The common stock had no voting rights and no dividends were payable thereon until all accumulated dividends on preferred stock were paid and the preferred *122 stock was fully redeemed, at which time the common was to be vested with exclusive voting rights. Petitioner's capital was required to be at least equal to the aggregate par value of its outstanding preferred stock plus $1 for every share of outstanding common stock. The corporate by-laws prohibited the payment of any dividend which would impair the capital. No dividends were ever paid on any of petitioner's stock. The officers and directors of petitioner were Benjamin B. Davis, Robert H. Davis, Sr., and Robert H. Davis, Jr. Robert H. Davis, Sr., died February 15, 1932, and his shares of the common stock of petitioner and B. B. Davis & Co., Inc., passed in trust to the trustees under his will, consisting of Robert H. Davis, Jr., Benjamin B. Davis, and a corporate trustee. The income of the testamentary trust was payable to Robert H. Davis, Jr., for life and upon his death the corpus was payable to the testator's descendants appointed under his son's will. On July 28, 1933, Benjamin B. Davis gave his shares of petitioner's common stock to his wife, Florence H. Davis. On December 15, 1936, an agreement and plan of reorganization was entered into between the petitioner and its stockholders, *123 consisting of B. B. Davis & Co., Inc., the trustees under the will of Robert H. Davis, Sr., and Florence H. Davis. Benjamin B. Davis was also a party to the agreement. The agreement provided that the number of directors of petitioner be increased from three to four; that petitioner's certificate of incorporation be changed to vest all voting rights in its common stock; that its preferred stock have no right to vote whatsoever; that the common stock be divided into class A and class B, with no distinction between such classes, except that each class be entitled to elect two directors, and that B. B. Davis & Co., Inc., be dissolved. The agreement further provided that petitioner and the stockholders of B. B. Davis & Co., Inc. * * * exchange the issued and outstanding preferred stock of the * * * [petitioner] for debenture bonds of the * * * [petitioner] in a principal amount equal to the par value of the preferred stock exchanged therefor (it being understood, however, that the present fair value of the assets of the * * * [petitioner] is such that the fair value of the preferred stock of the * * * [petitioner] and the debenture bonds to be issued in exchange therefor, are *124 much less than the par value of such preferred stock and the principal amount of the debenture bonds to be issued in exchange therefor), which said debenture bonds shall be payable on January 1, 1960 with interest thereon at the rate of three and one-half (3 1/2%) per centum per annum, to be computed from the date of the issuance thereof and payable on the last day of each and every calendar month, commencing with the month in which said bonds are issued, and the said preferred stock of the * * * [petitioner] shall be redeemed by such exchange and retired. The quoted portion of the agreement relating to value was inserted because it was then believed that the preferred stockholders would not be paid in full in the event of a forced sale. Petitioner was solvent on a going concern basis. The agreement and plan of reorganization was ratified on behalf of petitioner by its board of directors on December 30, 1936. The directors on that date were Benjamin B. Davis, who was also president, and Robert H. Davis, Jr., who was also secretary of petitioner. In the meanwhile, petitioner's articles of incorporation had been amended consistent with the plan of reorganization and B. B. Davis *125 & Co., Inc., had been dissolved. New certificates of preferred stock were issued to the former stockholders of the latter corporation, to-wit, Benjamin B. Davis and the trustees under the will of Robert H. Davis, Sr. These certificates represented the total outstanding preferred stock of petitioner. On December 31, 1936, pursuant to the agreed plan of reorganization and resolution of its board of directors, petitioner redeemed all of its preferred stock in exchange for two debenture notes in the principal amount of $375,000 each, payable January 1, 1960, with interest at 3 1/2 per cent, payable monthly. These notes were identical except for the names of the payees, who were Benjamin B. Davis and the trustees under the will of Robert H. Davis, Sr. The note issued to the trustee follows: 00
100
$375,000
No. 1
250 HUDSON STREET CORPORATION Three and One-half (3 1/2%) Per Cent. Debenture Due January 1, 1960 250 HUDSON STREET CORPORATION(hereinafter called the "Corporation"), for value received, hereby promises to pay to ROBERT H. DAVIS, BENJAMIN B. DAVIS and THE CONTINENTAL BANK & TRUST COMPANY, as Trustees under the Last Will and Testament of *126 ROBERT H. DAVIS, Deceased, or order, on the 1st day of January, 1960 (unless this indenture shall have been sooner redeemed or retired), the sum of THREE HUNDRED SEVENTY-FIVE THOUSAND ($375,000.00) Dollars, in legal currency of the United States of America, and to pay interest thereon from the date hereof at the rate of three and one-half (3 1/2%) per cent. per annum, such interest to be payable in like legal currency on the last day of each and every calendar month in each year. Both the principal and interest of this debenture shall be payable at the office of the Corporation. This indenture is one of a duly authorized issue of SEVEN HUNDRED FIFTY THOUSAND ($750,000.00) Dollars principal or par value of three and one-half (3 1/2%) per cent. indentures of the Corporation due January 1, 1960. All of said indentures are issued under and pursuant to an agreement and plan of reorganization of the Corporation, to which the Corporation is a party, dated December 15, 1936, and under and pursuant to a resolution of the Board of Directors of the Corporation adopted December 30, 1936. The right is hereby reserved to the Corporation, by unanimous resolution of the Board of Directors of the *127 Corporation, at any time upon giving thirty (30) days' notice in writing of its intention to do so, to redeem any and all of said debentures at such time outstanding, by the payment of the principal or par value thereof, plus accrued interest to the date of such redemption. This indenture is transferable only on the books of the Corporation in person or by duly authorized attorney, upon surrender of this debenture properly endorsed. IN WITNESS WHEREOF, 250 HUDSON STREET CORPORATION has caused this instrument to be signed by its President and its corporate seal attested by its Secretary, to be hereunto attached, all as of this 31st day of December, 1936. 250 HUDSON STREET CORPORATION By (Signed) Benjamin B. Davis, President By (Signed) Ralph Farrington, Treasurer Attest: Robert H. Davis, Jr., Secretary After the exchange of petitioner's preferred stock for debenture notes all of the preferred stock was retired. The common stock was then reclassified in accordance with the plan of reorganization. The outstanding capital stock ofpetitioner thereafter consisted of four shares of common stock, two shares of class A being held by the trustees under the will of Robert H. Davis, *128 Sr., and two shares of class B being held by Florence H. Davis. The stated value of these shares in the capital account was $5. The actual value of the shares is not disclosed by the present record. No dividends have ever been paid by petitioner on any class of its stock. Petitioner's debenture notes were exchanged for its preferred stock without payment of any unpaid dividends which had accumulated on the stock. Prior to the exchange the net earnings of petitioner had been paid to reduce the principal of a mortgage secured by petitioner's land and building. The original building mortgage loan was in the principal sum of $1,250,000. When the building was completed the principal was reduced to $1,225,000, payable in 10 years, secured by the original mortgage which was then held under an assignment by the Prudential Insurance Company of America. During the term of the mortgage the principal was further reduced to $1,000,000. The interest on the debenture notes has been paid regularly and the payments have been recorded on petitioner's books in an account denominated "interest on debentures". Neither note has been retired nor have any payments on account of principal been made. The *129 Prudential Insurance Co., as mortgagee, has demanded all net earnings in excess of the interest paid on the notes. When the mortgage became due the mortgagee demanded a further reduction of principal to $800,000. Petitioner was unable to refinance the mortgage for any greater sum, but it was able to obtain an extension agreement on August 23, 1940, which expressly recognized the interest payable on petitioner's debenture notes. The agreement (which was in force for a term of approximately 5 years) provided, inter alia, that payments on the principal of the mortgage were to be paid only out of petitioner's net income. Net income was defined by the agreement to mean income less specified deductions, including "payments of interest not to exceed $26,250 on the debentures of 250 Hudson Street Corporation". This amount represented the annual interest charges on the two debenture notes. Petitioner had no outstanding indebtedness other than the mortgage and its debentures. The payment of $26,250 in each of the taxable years 1940 and 1941 was a payment of interest on an indebtedness of petitioner. Opinion. - We next consider whether payments made on the debenture notes in each of the taxable *130 years are deductible as interest under Section 23(b), [3] Internal Revenue Code. The primary question is whether the debenture notes, which were issued in exchange for preferred stock, constitute an indebtedness. The statute does not define an indebtedness. In deciding this question we must examine the characteristics of the obligations and all of the surrounding circumstances. John Kelley Co., 1 T.C. 457, reversed, 146 Fed. (2d) 466, in turn reversed, 326 U.S. 521. The obligations in question have the caption "debenture"; they have fixed maturity dates; interest is payable monthly at fixed rates regardless of earnings; the right to enforce payment of principal and interest is not conditional; and on dissolution the obligees would rank with unsecured creditors to the exclusion of stockholders, if necessary. Obligations bearing similar characteristics have been held to be an indebtedness. John Kelley Co., supra; *131 Commissioner v. Hood & Sons, Inc., 141 Fed. (2d) 467; Cleveland Adolph Mayer Realty Corp., 6 T.C. 730 (No. 95). Respondent concedes that in form the debenture notes issued by petitioner have all the characteristics of an indebtedness. Respondent's position is that the payments made on the debenture notes are not deductible "for the reason that they were in reality not payments on a bona fide indebtedness but rather a form of dividends paid to the former stockholders of petitioner." Thus, he attacks the validity of the indebtedness on the ground of the circumstances surrounding the transaction between petitioner and its stockholders in 1936. He cites the fact that petitioner was a closely held family corporation; that under a reorganization its debenture notes were issued in exchange for preferred stock of uncertain value; that no new assets were received by petitioner from the exchange; that the debenture obligees held the same face value and proportionate interest as they had before the exchange; and that the capital stock of petitioner had a stated value of $5 after the exchange. Respondent contends that under these circumstances no real business purpose *132 was served by the reorganization and exchange and that it was merely a sham undertaken for purposes of tax avoidance. Petitioner contends that the primary purpose of the reorganization and exchange was to give it a better bargaining position in resisting the demands of its mortgagee for reduction of the mortgage debt; that the mortgagee recognized the debenture notes as an indebtedness and allowed payment of interest thereon before requiring payment on the mortgage debt. There is no evidence that the purpose was to avoid taxes or was a mere sham. The position of the respondent here is similar to that which he took in Cleveland Adolph Mayer Realty Corp., supra. There, as in the instant case, he stressed the lack of a business purpose in the issuance of the debentures. In that case, as here, respondent cited 1432 Broadway Corp., 4 T.C. 1158. We carefully distinguished that case in deciding the Mayer Realty Corporation case and we think that it is likewise distinguishable from the present case, While the preferred stock here may not have had full value at the time of the exchange, the evidence is that it had substantial value. It was originally issued in an amount equal *133 to the appraised value of land for which it was given in payment. Subsequently, petitioner paid substantial amounts in reduction of a building mortgage secured by the land, and the resulting increase in petitioner's equity served to offset depreciation in the original value behind the stock. In any event the issuance of debenture notes for less than value is not fatal. Dade-Commonwealth Title Co., 6 T.C. 332. We hold that the debenture notes in question constitute an indebtedness of petitioner and that the interest paid thereon within the taxable years is deducible from gross income. Decision will be entered under Rule 50. Footnotes
1. Petitioner's Exhibit No. 1.↩
2. The difference in accounting methods is illustrated by tables which follow the quoted portion of Bulletin "F." The composite rate given for an office building of average construction is 2 1/2 per cent or a total life of 40 years. The total life of an office building of standard construction where the building equipment is set up as a separate account is given as 67 years.↩
3. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: (b) Interest. - All interest paid or accrued within the taxable year on indebtedness * * *↩