402 A.2d 686

**Frederick J. O'REILLY, Appellant,**

**v.**

**CELLCO INDUSTRIES, INC.**

Superior Court of Pennsylvania.

Argued Oct. 25, 1978.

Decided April 25, 1979.

560

Gerald S. Lesher, Pittsburgh, for appellant.

James H. McConomy, Pittsburgh, and with him John C. Unkovic, Pittsburgh, for appellee.

Before CERCONE, WIEAND and LIPEZ, JJ.

LIPEZ, Judge:

This is an appeal from the trial court's judgment in favor of appellee, defendant below, in an action begun by appellant, plaintiff below, by confessing judgment on certain notes executed by appellee.[1]

Appellee, Cellco, Inc. (Cellco), was incorporated on April 18, 1967. There were six shareholders: Robert E. Lee, Frank Diekneite, Donald Schmuck, Donald Hamilton, Frederick J. O'Reilly, and Phillip Crowley.[2] Cellco elected to operate under Subchapter S[3] of the Internal Revenue Code. Cellco borrowed money from the Small Business Administration (SBA) in order to purchase a plant in Donora, Pennsylvania. The loan agreement with the SBA required each shareholder of record at the time of any subsequent distribution of profits by Cellco before the loan was repaid to put back into Cellco one-fourth of the amount of such distributions remaining after payment of taxes thereon.

On October 22, 1970, Lee, Diekneite, Schmuck and Crowley entered into an agreement with Cellco (the Buyout Agreement) providing that Cellco would purchase the stock held by the four in exchange for cash payments totaling $550,000. O'Reilly and Hamilton would then be the only stockholders. In order to secure the payment obligation, O'Reilly and Hamilton were required to deposit in escrow all but ten of their combined shares in Cellco. O'Reilly testified that the closing date for the Buyout Agreement was November 1, 1970. This was also the first day of Cellco's fiscal year 1971. In December of 1970, O'Reilly, acting as presi-

---

1. Appellee inexplicably maintains, in its Counter-Statement of the case, that the lower court dismissed appellant's complaint. This did not occur. The order of the Common Pleas Court *en banc* plainly shows that judgment was entered in favor of appellee.

2. Lee, Diekneite and Schmuck held twenty shares each, O'Reilly held thirty shares, and Hamilton and Crowley each held forty shares. O'Reilly was President and Chief Executive Officer.

3. I.R.C. (26 U.S.C.) §§ 1371–1379 (1978). Subchapter S allows electing small business corporations and their stockholders meeting certain requirements to avoid double taxation on corporate earnings and profits.

dent, caused Cellco to distribute profits totaling approximately $116,000 to himself and Hamilton, as the only shareholders of record on the date of the distribution. O'Reilly's share was approximately $68,000 before taxes. Pursuant to the SBA loan agreement, O'Reilly, as he had after previous distributions, returned to the corporation 25% of the amount of the distribution remaining after paying his personal income taxes. Hamilton likewise returned 25% of his net share of earnings and profits. They took back from Cellco certain instruments, labeled notes, evidencing these advances.

In mid-1972, O'Reilly caused Cellco to hire Hamilton as a vice-president. During his employment (April, 1972 through May, 1973), Hamilton received $28,562.50 from Cellco as salary. On a number of occasions, O'Reilly's son, F. R. O'Reilly, removed from the plant, and sold, scrap metal belonging to Cellco. The purchasers paid F. R. O'Reilly and not Cellco a total of $6,694.92.[4]

Cellco eventually defaulted on the Buyout Agreement and, on March 20, 1972, a Consent Decree was entered, setting out a revised payment schedule. The Decree also provided that, in the event of further default, the stock held in escrow for the benefit of Crowley and Schmuck was to be transferred to them. Cellco defaulted on the first of the rescheduled payments, and on April 25, 1973, the court below, Wentley, J., order the transfer. This wiped out O'Reilly's stock holdings in Cellco. Crowley thereupon became president, and O'Reilly and Hamilton left Cellco's employ. Shortly thereafter, Hamilton assigned his note to O'Reilly for consideration, and O'Reilly caused judgment to be confessed on all of the instruments. Cellco responded by asking the lower court to strike or open the confessed judgment. The court below, Smith, J., opened the judgment, and the parties proceeded to trial of O'Reilly's claim that the instruments represented corporate debts then due him. The trial court, Watson, J., found that the instruments

4. This amount was stipulated by the parties.

were corporate debt and that O'Reilly was owed $54,701.21,[5] subject to certain setoffs. The lower court, sitting *en banc*, granted Cellco's exceptions and concluded that (1) the instruments represented shareholders' equity rather than debt; (2) the instruments were subordinated to other indebtedness of Cellco; and (3) that setoffs claimed by Cellco and allowed by the court *en banc* exceeded O'Reilly's claim. O'Reilly then brought his appeal. Although we conclude that the instruments represent corporate debt rather than equity, the setoffs allowable against O'Reilly's claim exceed it and thus we affirm the entry of judgment for Cellco.

## I.

The lower court *en banc*, relying on *Bidwell v. Pittsburgh, O. & E. L. Pass. Ry. Co.*, 114 Pa. 535, 6 A. 729 (1886) (which seems to be the only Pennsylvania state case ever to consider the issue), based its holding that the instruments represented equity primarily on the fact that the advancements by the stockholders had been proportionate to their share ownership. The facts of *Bidwell*, although superficially similar to those of the instant case, are distinguishable therefrom. In *Bidwell*, the three shareholders of a railway company voluntarily paid advances into the corporation in proportion to their ownership. One shareholder later sued the corporation for repayment of his advance on the theory that it was a debt. The Supreme Court of Pennsylvania affirmed the findings of a referee that the advancements had been to stockholders' equity. The court characterized the circumstances surrounding the payments as an "emergency," however, noting that the corporation's physical plant and real estate were in very bad repair; that much new equipment was required; and that the treasury was empty. There was no evidence concerning any instruments issued by the corporation in connection with the advance. In the case before us, although the advances were proportionate to the respective ownership interest of O'Reilly and Hamilton, this

5. The face amounts totaled $36,716.02 and interest to the start of the trial was $17,985.19.

was done only at the behest of the SBA. No evidence was introduced concerning the SBA's purpose in requiring these advances; it is probable that the contractual provision in the loan agreement was motivated merely by the SBA's desire to assure repayment of the loan. There is no evidence of record of financial or other extremity on the part of Cellco, nor does the evidence show that the advances were necessary to the continued operation of the corporation.

The instruments themselves, while, of course, not conclusive, are evidence that the parties intended that the transaction be treated as a corporate debt. They are labeled "Note" and they contain a fixed maturity date and rate of interest, and a confession of judgment clause. The notes recite that they are not negotiable and are subordinate only to Cellco's indebtedness to the SBA. The fact that O'Reilly, acting in his capacity as president, caused Cellco to issue the notes to him and then signed them as president is of little, if any, moment for state corporate law purposes. O'Reilly was then a major stockholder, president and chief executive officer of the corporation.[5a] Such a situation is far from uncommon, especially where small, closely-held corporations are concerned, and by itself evidences no misconduct on the part of O'Reilly.

Federal tax law, briefly discussed by the court below, is not conclusive in an action involving state corporation law issues in the courts of Pennsylvania. It provides at most some indication of the factors a state court may consider in analyzing issues of this nature. The tax cases offer no consistent rule, however, and an examination of them serves only to emphasize that this issue must be resolved in case-by-case determinations. In *Gilbert v. Comm'r*, 262 F.2d 512 (2d Cir. 1959), the Second Circuit approved consideration of seven factors in finding that certain advances by a taxpayer to a corporation which he controlled were equity and not

5a. Three of the notes were issued while the stock was owned as stated in note 2, *supra*. The rest were issued after the closing of the Buyout Agreement, at which time O'Reilly had become one of only two stockholders.

debt. The factors were: (1) the taxpayer realized that the corporation had been inadequately capitalized at its inception; (2) no outside investor would have made similar advances without security; (3) the advances were made substantially in proportion to the stock ownership of the stockholders; (4) the advances were made without regard to the normal creditor safeguards; (5) no effort was made to enforce the obligations; (6) the taxpayer had no reason to expect repayment unless the business were successful; and (7) as a matter of "substantial economic reality," the advances constituted risk capital. The evidence of record in the instant case shows only one of the seven, viz., that the advances were proportionate to the stock ownership of those who made them. The confession of judgment clause in each note is a common creditor safeguard; and O'Reilly's use of it is an attempt to enforce the obligations.

A consideration of other tax cases indicates that a finding of debt for federal tax purposes is not precluded by a finding of one or more of the Second Circuit's indicia of equity. Debt has been found where principal was subordinated to other debts, *Comm'r v. Page Oil Co.*, 129 F.2d 748 (2d Cir. 1941); where there is a fixed maturity date, *U. S. v. South Georgia Ry. Co.*, 107 F.2d 3 (5th Cir. 1939); where debentures were issued proportionately to stockholders after the company had *unsuccessfully* attempted to obtain funding from outside sources, *Brighton Recreations, Inc.*, T.C.M. 1961–29; where debentures were subordinated to commercial bank loans, were substantially at the risk of the business and would have been unattractive to outside investors, *Gordon Lubricating Co.*, T.C.M. 1965–132; where the debt-equity ratio was "approximately 110,000 to zero," *Taft v. Comm'r*, 314 F.2d 620 (9th Cir. 1963); and where the debentures were in "conventional" debt form, with no ambiguous stock characteristics, *Kraft Foods Co. v. Comm'r*, 232 F.2d 118 (2d Cir. 1956). As this review of the area shows, "the determination whether funds advanced are to be regarded as a 'capital contribution' or 'loan' must be made in the light of all the facts of the particular case. Rarely should any one

element be determinative." *Gilbert, supra* at 514. The United States Supreme Court has held that "[t]here is no one characteristic . . . which can be said to be decisive in the determination of whether the obligations are risk investments in the corporations or debts." *John Kelley Co. v. Comm'r*, 326 U.S. 521, 530, 66 S.Ct. 299, 90 L.Ed. 278 (1946).

■ In summary, we hold, under the law of Pennsylvania, that the obligations at issue in the instant case are debts owed by Cellco to O'Reilly; we so hold because the instruments on their face are debt instruments and, based on the evidence adduced at trial, the parties thereto (Cellco and O'Reilly) obviously intended that the obligations be so treated there being no evidence of record to show anything to the contrary.

## II.

We turn now to consideration of the setoffs claimed by Cellco against its debt to O'Reilly.

Cellco first claims as a setoff the portion of the $116,000 profits distribution retained by O'Reilly after the return to Cellco of 25% of the amount remaining after payment of his personal income tax thereon. Cellco, bases this claim on the following paragraph of the Buyout Agreement:

> [Cellco] shall pay no salary or other compensation to anyone as an officer, director, shareholder or agent other than O'Reilly, union members, and non-union salaried office employees. The shareholders of record may, however, receive any amount necessary to pay income taxes on that part of the undistributed profits of [Cellco] taxed to said shareholders. Any such undistributed profit may nevertheless be used if necessary to retire [Cellco]'s obligations.

Cellco apparently maintains that this provision obligated Cellco to distribute no profits to shareholders except that amount needed by the shareholders to pay personal income taxes on their respective shares thereof, and to use undis-

tributed profits only for the purpose of retiring Cellco's obligations. The lower court *en banc* found that O'Reilly had breached his fiduciary duty to Cellco as its president when he caused it to distribute to him as stockholder more than he needed to pay his taxes on his share of profits, and thus held that the amount retained by O'Reilly should be set off against his claim. O'Reilly's position is that, in order to retain its special tax advantages under Subchapter S of the Internal Revenue Code, Cellco was required to distribute all of the profits for each fiscal year to shareholders. This, simply, is not true as a matter of law. *See* I.R.C. (26 U.S.C.) §§ 1371–1379 (1978).

On its face, the subject paragraph of the Buyout Agreement admits of a certain ambiguity. The provision bars payment of "salary or other compensation" to anyone except O'Reilly (and certain others), but it is not certain that dividends (or Subchapter S distributions) are not "other compensation." Further, while the provision makes mention of "undistributed profits," it, arguably, does not require that the corporation retain any profits at all. However, Phillip Crowley, who had been one of the selling shareholders, gave the following testimony at the trial:

Q. What were you told by Mr. O'Reilly and corporate counsel was to be done with the earnings of the corporation under that agreement?

A. The general discussion that prevailed at the time of that agreement because there was no—we did not have firsthand knowledge of the earnings of the company at that point. We knew they were substantial, but we did not have a current statement at that time as a company earnings. It was our understanding that the only money that would be paid out from the corporation to Mr. O'Reilly or Mr. Hamilton would be enough to pay the income tax on that portion of their earnings. That would be attributed to this—whatever they drew out of the corporation.

Q. All right, sir. Was anything said at those meetings contrary to that understanding?

A. Not that I recall.

(R. 216–17.) The trial judge, who also wrote the opinion for the lower court *en banc*, apparently chose to believe Crowley's explanation of the ambiguous paragraph, and we are bound by his finding.[6]  *See Castellucci v. Columbia Gas of Pa.*, 226 Pa.Super. 288, 310 A.2d 331 (1973).

■ Cellco asserts that the parties had stipulated that O'Reilly retained an amount in excess of his claim on the notes. The record does not support this claim, and indeed we find that no such stipulation was entered.[7]  O'Reilly testified in several places that he retained, respectively, $23,000, $24,000 and $26,000. Taking the admission most favorable to O'Reilly, we find that he retained $23,000, which amount will be allowed as a setoff against his claim.[8]

■ The finding of the lower court *en banc* that O'Reilly further breached his fiduciary duty to Cellco by allowing his son to remove from the plant and sell scrap metal owned by

**6.** Although O'Reilly's counsel objected to what he called Crowley's "interpretation" of the contract, the court made no ruling (and no comment at all) thereon. Counsel did not pursue the matter further, took no exception to the court's failure to rule, and does not raise the issue on this appeal. The issue, therefore, has not been preserved for appellate review and is waived. *Dilliplaine v. Lehigh Valley Trust Co.*, 457 Pa. 255, 322 A.2d 114 (1974).

**7.** On this appeal, O'Reilly argues that Cellco has not "sufficiently established that certain claims should be allowed as setoffs." It is on this basis that we hold the lower court's finding that this stipulation was made clearly erroneous.
  The discussion concerned was as follows:
  Mr. McConomy [attorney for Cellco]: Your Honor, we might short cut it if Mr. Lesher [attorney for O'Reilly] will stipulate with me that Mr. O'Reilly put more in his pocket than he is claiming in this lawsuit.
  Mr. Lesher: What difference does that make?
  Mr. McConomy: We are claiming it is a set-off as in violation of the agreement.
  Mr. Lesher: We don't deny that he took $68,000. No we don't have any objection to that. I'll stipulate that he was paid back.
  (R. 100–01) Other testimony by O'Reilly clearly shows that the figures of $68,000 refers to O'Reilly's pre-tax share of the profits distribution.

**8.** We need not determine the amount precisely, because the total of the setoffs allowed exceeds O'Reilly's claim by nearly $18,000.

Cellco and then keep the proceeds is supported by the evidence. The setoff of $6,694.92 as determined by the court below *en banc* is affirmed.

■ The *en banc* court also allowed as a setoff the amount of $13,843.65, which was the amount of various advances O'Reilly had caused Cellco to make to him and members of his family. We affirm this finding. O'Reilly contests on this appeal only $9,800 of this amount. He argues, as to $5,000 of that amount that the ledger entries reflecting it were auditor's adjustments that did not necessarily indicate actual advances. Cellco's bookkeeper during O'Reilly's tenure as president, called in rebuttal by O'Reilly, testified only that the auditors had told her to make the entry. She testified that she didn't know whether O'Reilly actually owed Cellco the $5,000. The evidence thus supports the conclusion of the court below that this amount be allowed as a setoff. O'Reilly argues that since the remaining $4,800 was evidenced at trial only by the corporate ledger, and not by the journal from which the entries were then taken, that amount was proven by secondary evidence and not by the best available evidence. Since the books of original entry are not necessarily the best evidence of a running account, *Vondersmith v. Kloidt*, 143 Pa.Super. 170, 173, 17 A.2d 706, 707 (1940), and the ledger entries in the instant case satisfy the requirements of the Uniform Business Records As Evidence Act, 28 P.S. § 91b, the ledger was properly admitted by the trial court. *See Bell Telephone Co. v. Daniel*, 16 Chester Co. 284. The court's finding that the $4,800 should be allowed as a setoff is supported by competent evidence.

■ Finally, the trial court, in its first opinion, found that O'Reilly had breached his fiduciary duty to Cellco by causing the corporation to hire Hamilton as a vice-president and to pay him salary totaling $28,562.50. The court allowed the full amount as a setoff. O'Reilly asserts that "business necessity" justified the employment of Hamilton to resolve disputes with customers, but it cannot, because payment of salary to any officer but O'Reilly was expressly forbidden by

the above-quoted paragraph of the Buyout Agreement. He argues that a setoff for Hamilton's salary would unjustly enrich Cellco because Crowley and Schmuck knew that Hamilton was employed by Cellco and made no objection. But they need not have made any active objection to this breach of the Buyout Agreement in order to preserve their right to claim Hamilton's salary as a setoff. O'Reilly's breach of his fiduciary duty resulted in the improper payment of a salary to Hamilton, and the trial court's original conclusion that the entire amount be allowed as a setoff against his claim is affirmed.[9] Since the sum of these setoffs exceeds O'Reilly's claim, we need not determine whether the notes are subordinate to other indebtedness of Cellco.

Affirmed.

9. The *en banc* court opinion incorporated therein by reference the original opinion.