Raleigh Properties, Inc. v. Commissioner.
Raleigh Properties, Inc. v. Commissioner
Docket No. 86988.
United States Tax Court
T.C. Memo 1962-150; 1962 Tax Ct. Memo LEXIS 161; 21 T.C.M. (CCH) 812; T.C.M. (RIA) 62150; June 22, 1962
*161 Petitioner purchased a hotel in 1953 for a stated purchase price of $3,240,000. Sellers took back an 11-year note in the stated amount of $1,548,739.10. The contract recites that the note is to be without interest, but it includes a prepayment discount schedule. Earlier negotiations contemplated a purchase price of $2,800,000, with the sellers taking back a note bearing interest at 4 1/2 percent for 11 years in an amount approximately $440,000 less than the note finally given by petitioner. The discount schedule closely paralleled the interest which would have accrued under petitioner's earlier offer. Held, that the stated purchase price of $3,240,000 included $440,000 of prepaid interest, a proportional part of which petitioner is entitled to deduct in each of the taxable years. Held further, that the actual purchase price of $2,800,000 is allocable among the land and the several other classes of depreciable assets in proportion to the value of the assets at the time of the sale. Held further, that the amount of $567,000 advanced to petitioner by its sole stockholder at about the time of the acquisition of the property was a contribution to capital and deductions for interest *162 thereon not allowable. Held further, that respondent has properly asserted the addition to the tax for failure timely to file a return for 1955. Palmer Johnson Esq., 6225 Wilshire Blvd., Los Angeles, Calif., and Conrad T. Bjornlie, Esq., for the petitioner. Marion Malone, Esq., for the respondent. BRUCE Memorandum Findings of Fact and Opinion BRUCE, Judge: Respondent determined deficiencies in income taxes and an addition to tax for the years and in the amounts which follow: Addition to Tax
Taxable
Sec. 6651(a),
Year Ending
Deficiency
I.R.C. 1954
October 31, 1954
$37,251.16
October 31, 1955
32,711.17
$8,177.79
October 31, 1956
43,110.29
By an amendment to his answer, respondent has proposed an increase in the deficiencies and *163 addition to tax based on necessary adjustments of the depreciation allowed in the notice of deficiency as the result of the determination of the issues in controversy, as follows: October 31, 1954
$25,319.36
October 31, 1955
24,298.07
$6,074.52
October 31, 1956
21,384.97
The following questions are before us for determination: (1) Whether petitioner properly accrued and deducted interest with respect to an asserted prepayment of interest in the amount of $440,000; (2) whether the purchase price of the Raleigh Hotel to be allocated among nondepreciable land and several classes of depreciable assets is $3,240,000 or $2,800,000, or some other amount, and what is the proper allocation of the purchase price; (3) whether claimed interest deductions with respect to an alleged loan of $567,000 made to petitioner by its sole stockholder are allowable; and (4) whether petitioner is liable for the 25 percent addition to tax for failure to file a timely income tax return for the taxable year ending October 31, 1955. Findings of Fact Certain facts have been stipulated and they are included herein by this reference. Petitioner is a California corporation with its *164 principal place of business in Washington, D.C. It keeps its books on an accrual basis. Its returns were for a fiscal year ending October 31. During the years involved petitioner owned and operated The Raleigh Hotel, located on the northeast corner of Pennsylvania Avenue and 12th Street, N.W., Washington, D.C. It purchased the hotel properties from Louis Berry and associates, hereinafter referred to as the sellers, on October 26, 1953. The contract of purchase and sale was negotiated by the sellers and Joe Massaglia and was assigned by Massaglia to petitioner before consummation of the sale. In these negotiations the sellers were represented by a broker, Nordblom Company, Boston, Massachusetts, and Peter A. Miller, one of Louis Berry's associates. By letter dated September 1, 1953, Nordblom Company wrote to Massaglia's attorney, Palmer Johnson, offering to sell the hotel property to Massaglia for $2,800,000. The letter was in the form of an offer from Massaglia to purchase the property. Under the terms of the offer the purchase price of $2,800,000 was for all of the property including land, buildings, building equipment and personal property used in the hotel business. There was *165 to be a cash payment of $25,000 with the offer, a further cash payment of $535,000 on closing the contract and a purchase money bond of $2,240,000, bearing interest at 4 1/2 percent and running for 21 years. On October 26, 1953, Massaglia, through his attorney, made an offer to the sellers differing in some respects from the offer of September 1, but still providing for a purchase price of $2,800,000, with a cash payment of $560,000 and interest of 4 1/2 percent on the deferred portion of the purchase price. This offer was acceptable to the sellers except that they insisted that the full amount of the interest on the deferred payments, which was computed at $440,000, be included in the face amount of the purchase money note to be held by the sellers. Massaglia accepted this condition but only on the further condition that discounts on the interest be allowed for any prepayment of the purchase money note, which was permissible under the proposed agreement. Accordingly, in the final agreement, which was dated October 26, 1953, the note for the deferred purchase price contained the additional amount of $440,000 and a schedule of discounts to be allowed for any prepayments thereon. The *166 note was made noninterestbearing. The sales agreement contained, among others, the following provisions: The purchase price shall be THREE MILLION TWO HUNDRED AND FORTY THOUSAND DOLLARS ($3,240,000.00), payable as follows: Attached hereto is my certified check for Fifty thousand dollars ($50,000.00) to be cashed by you upon your acceptance of this offer, and I will pay you an additional Five hundred and ten thousand dollars ($510,000.00) in Cashier's or certified check on the closing date, which shall be on or before December 1st, 1953, and not later. I understand that there is a certain first mortgage now against this property held by the National Life and Accident Insurance Company of Nashville, Tennessee, having an unpaid principal balance of $1,139,961.03, and bearing interest at the rate of four per cent (4%) per annum on the unpaid principal balance, and which interest thereon is paid to October 1st, 1953, and payable in installment payments of $12,500.00 per month until September 1st, 1955, and thereafter at the rate of $10,000.00 per month until the maturity date, January 1st, 1965, each installment including interest to date of payment. I will execute a purchase money *167 note payable to you and secured by a recordable second mortgage and chattel mortgage upon the building and land and personal property purchased hereby, to be prepared by your counsel, in the amount of the purchase price less the $560,000.00 total cash payment and the amount due on the said first mortgage on the closing date, and which said purchase money note shall be payable in installments of Six thousand dollars ($6,000.00) per month commencing thirty days after the closing date and on the same day of each month thereafter until September 1st, 1955, and then payable in installments of Seven thousand five hundred dollars ($7500.00) per month commencing September 1st, 1955, and on the first day of each month thereafter, all without interest thereon except after default and then at the rate of seven per cent (7%) per annum, and the entire amount of said note to be paid not later than January 1st, 1965, said note to contain an acceleration clause in the event of thirty days default and to provide for attorney fees in the event of suit thereon. Said note shall contain a pre-payment discount schedule in accordance with Schedule "A" attached hereto. I have examined the first mortgage to *168 the National Life and Accident Insurance Company of Nashville, Tennessee, and am familiar with the terms thereof, and upon closing agree to assume and perform all the conditions thereof. Schedule "A" of the above-cited document contains the following provisions: The following constitutes the pre-payment discount schedule pertaining to the second purchase money note and mortgage referred to in the attached agreement. In the event of the payment upon any installment date of the entire principal balance owing upon said second purchase money note, there shall be deducted from the unpaid principal balance the discount set forth opposite the following respective period applicable to the date of such payment in full: Discount from
Period (Payment Date)
Principal Balance
To and including December 1, 1954
$400,000.00
To and including December 1, 1955
350,000.00
To and including December 1, 1956
300,000.00
To and including December 1, 1957
250,000.00
To and including December 1, 1958
200,000.00
To and including December 1, 1959
165,000.00
To and including December 1, 1960
130,000.00
To and including December 1, 1961
100,000.00
To and including December 1, 1962
60,000.00
To and including December 1, 1963
30,000.00
*169 The contract of sale as finally entered into provides for assignment as follows: This offer may be assigned by me prior to closing to an individual or corporation to be formed for the purpose of taking title thereto, and in such event you agree to accept such assignee as the sole maker of the promissory note and second mortgage and chattel mortgage described above. The contract was assigned to petitioner by Massaglia on or about November 24, 1953, and on that date the sale of the property to petitioner was consummated in accordance with its terms. In its books petitioner entered the hotel properties at a cost of $2,800,000, and set up $440,000 as "prepaid interest." Thereafter, petitioner set up on its books each year, and claimed as a deduction in its returns, a proportional part of the $440,000 as an interest expense. The amounts claimed in the taxable years 1954, 1955, and 1956 were, respectively, $44,056.31, $48,412.19, and $46,826.13. Respondent has disallowed the deductions so claimed. The Raleigh Hotel properties are located on lots 803 and 808 in square 322. They contain a total of 27,380 square feet. The hotel building is located on lot 803. This lot has a frontage *170 of 241.23 feet on the east side of 12th Street, and 71.75 feet on the north side of Pennsylvania Avenue. It contains 23,000 square feet. Lot 808 has a frontage of 40 feet on the west side of 11th Street, starting 90 feet south of E Street, and a depth of 100.08 feet. It contains 4,380 square feet. The hotel has a maximum height of 13 stories, and has 420 rooms. It has a basement floor space of 26,649 square feet and a total above-basement floor area of 246,822 square feet. The construction is reinforced steel and brick. The north one-fourth section of the building was constructed in 1900, the adjoining one-fourth in 1906, and the south one-half in 1912. There is a service building adjacent to the main hotel building. The section thereof fronting on 11th Street is two and three stories in height; the section adjacent to the hotel has a maximum height of six stories. Together they have a basement area of 4,375 square feet and a total abovebasement floor area of 16,000 square feet. The building is only partially utilized. Square 322, on which the hotel is located, contains another hotel, The Harrington, on the northeast corner. The Evening Star Building is located on the southeast corner. *171 The square contains a number of smaller buildings occupied by drug stores, restaurants, and other small merchandising businesses. The Raleigh Hotel is near the center of Washington's downtown business area and is in close proximity to a number of Government office buildings including the Old Post Office Building and that occupied by the Internal Revenue Service, directly across Pennsylvania Avenue, the Department of Justice, in the next block to the east, the Post Office Department, directly across Pennsylvania Avenue and one block to the west, the Department of Commerce, Department of Labor, and National Archives. In its returns petitioner allocated the cost of the entire property, $2,800,000, as follows: Building
$1,710,000
Land
300,000
Plumbing and improvements
(building equipment)
420,000
Air conditioners
42,000
Furniture, fixtures (other equip-
ment)
328,000
$2,800,000
In this proceeding petitioner has submitted an allocation based on an appraisal of the properties by Paul W. Schumacher, a professional appraiser who appeared at the hearing as an expert witness for petitioner. The appraiser inspected and valued each separate class of assets. *172 The respondent has made a similar allocation by a somewhat different method, using both the amount of $3,241,943.23 [1] and the amount of $2,800,000 as the cost figure. His allocation is based on an appraisal made by Glen A. Ruggles, a valuation engineer in the employ of the Internal Revenue Service. He also appeared as an expert witness in this proceeding. Ruggles' allocations are as follows: (1)
(2)
Land
$1,642,800.00
$1,642,800
Hotel building proper
937,500.00
684,525
Building equipment
312,500.00
228,175
Furniture and fixtures
250,000.00
182,500
Window air conditioners
42,000.00
42,000
11th Street buildings
57,143.23
20,000
Total
$3,241,943.23
$2,800,000
Schumacher's allocations are: Land
$ 608,777
Basic building structure
1,368,910
Mechanical building equipment
399,942
Window air conditioners
42,000
Portable equipment
379,371
Total
$2,800,000
In its allocation *173 petitioner has valued the land at an average value of approximately $30 per square foot while in respondent's allocation it is valued at an average of $60 per square foot. The value of the land alone at the time the petitioner purchased the hotel properties was $55 per square foot, or $1,505,900 for the entire area. Facts Relating to Note Held by Massaglia The corporate minutes of the petitioner state that on January 12, 1954, a special meeting of the board of directors was held and that at the request of Massaglia it was resolved that the corporation issue its promissory note to him in the amount of $567,000 for funds which had been advanced by him. It was further resolved that the note be dated January 1, 1954; that it bear interest of 3 percent per annum, payable annually; and that it be payable two years from its date. This note was replaced when it became due by a note dated January 1, 1956, in the amount of the then-remaining balance of $391,000. The new note bore the same interest rate but the interest was payable quarterly. It carried no specific maturity date, being payable one year and one month after written demand. The original note was for approximately the *174 amount of cash payment needed to complete the purchase of the hotel property. The notes were not secured in any way, either by a mortgage or pledge of collateral or by any guaranty or assumption of personal liability for the payment of the note by any of the stockholders, directors, or officers of the petitioner. The capital structure of the petitioner as of December 1, 1953, as shown by its balance sheet consisted of liabilities of $1,087,323.29 on the first trust deed, $1,524,739.10 on the second trust deed, and $567,000 due to Massaglia, or a total of $3,179,062.39. The equity represented by capital stock was $25,000. The debt-equity ratio, as of December 1, 1953, was 127.16 to 1. As of March 31, 1954, after four months of operation, the petitioner's balance sheet shows a deficit equity of $7,862.69. The petitioner made payments to Massaglia in 1954, 1955, and 1956 as follows: Approximate Date
Payment
Balance
Original amount
$567,000
May 14, 1954
$10,000
557,000
January 24, 1955
40,000
517,000
April 8, 1955
35,000
482,000
April 11, 1955
15,000
467,000
June 30, 1955
60,000
407,000
September 27, 1955
16,000
391,000
April 16, 1956
25,000
366,000
April 23, 1956
15,000
351,000
May 23, 1956
500
350,500
*175 Petitioner accrued interest payments on the Massaglia note of $14,036.67 in 1954, $14,296.93 in 1955, and $11,185.37 in 1956. Those amounts were claimed as interest deductions in petitioner's returns and were reported as taxable income by Massaglia on his individual returns. Facts Relevant to Petitioner's Filing of Its Income Tax Return for the Fiscal Year Ending October 31, 1955 The income tax return of the petitioner for the fiscal year ending October 31, 1955, was filed on April 4, 1957. It bears the signature of Joe Massaglia, Jr., with the date of March 26, 1957, noted by his signature, and also bears the signature of another person, with the date of March 15, 1957, noted by his signature. An application for automatic extension of time to file the return, dated January 16, 1956, was received on January 17, 1956. The automatic extension was for three months under section 6081(b) of the Internal Revenue Code of 1954. By reason of the automatic extension the petitioner's income tax return for the fiscal year ending October 31, 1955, was due to be filed on or before April 15, 1956. Opinion The first question for our consideration is whether the *176 purchase price of the property was $3,240,000, as respondent contends, and as was stated in the contract of sale, or was $2,800,000, as petitioner contends, with $440,000 of the stated purchase price representing prepaid interest on the purchase money note of $1,548,739.10. If petitioner's position is sustained, it is entitled to the interest deductions of a proportional part of such prepaid interest, which is claimed in each year and which respondent has disallowed. In support of its contention that the sale price was $3,240,000, respondent relies upon the strict terms of the sale agreement, where it was so stated. In the alternative he contends that if any interest was intended to be included in the stated sale price the amount is not identifiable or ascertainable on the evidence of record. In Elliott Paint & Varnish Co., 44 B.T.A. 241, a case involving somewhat similar circumstances, this Court stated at page 245: The question must turn, of course, upon what was the actual agreement of the parties. Was it an agreement to pay so much as purchase price and the balance as interest? This must be determined from all of the evidence, documentary and otherwise. *177 An intention of the parties different from that expressed in the documents witnessing their agreements will not lightly be assumed. The true substance of that intention is to be determined, however, from all of the evidence and is not limited to the formal contract or note. Elliott Paint & Varnish Co., supra; Judson Mills, 11 T.C. 25. Facts, not semantics, govern. Cf. Court Holding Co., 324 U.S. 331. Despite the recitation in the contract that the note is to be without interest, we are satisfied that interest was intended and paid. Petitioner's first offer to the sellers, dated October 26, 1953, proposed a price of $2,800,000 with an 11-year note in the approximate amount of $1,090,000, bearing interest at 4 1/2 percent, to be taken back by the sellers. The sellers' attorney contacted petitioner's attorney with respect to this offer. He noted that the interest thereunder would total very close to $440,000 over the term of the note, and stated that the sellers insisted that the $440,000 be added to the purchase price and to the note, and that the note be made noninterest-bearing. Petitioner's *178 attorney refused to accept this proposition, pointing out that petitioner had prepayment privileges and that the seller was, in effect, proposing that interest for the full period of the note be added thereto. Thus, if petitioner were to prepay under such circumstances, it would be paying interest for the full 11-year term of the note. The sellers' attorney then proposed a prepayment-discount schedule to be included in the contract and note, providing specified discounts in decreasing amounts over the term of the note. Petitioner's attorney accepted this proposal after satisfying himself that if petitioner prepaid the note as discounted on any of specified dates, the resultant cost to petitioner would approximate the originally-contemplated principal payments plus 4 1/2 percent interest to the date paid. The discount schedule was included in the contract and note. The $440,000 added to the stated purchase price and to the note is within $200 of the amount petitioner would have paid in interest under the terms of the buyer's offer of October 26, 1953. In Elliott Paint & Varnish Co., supra, the purchaser originally offered $27,500 in cash for a piece of property. *179 The seller refused the offer, preferring a deferred-payment plan. The final purchase price of $40,000 was agreed upon after a computation had been made for the seller showing that $27,500 plus interest thereon at 5 percent per annum for 10 years would total $41,250. This or a similar computation was discussed by the parties in arriving at the purchase price of $40,000. On brief, the petitioner therein set forth a table dividing the semiannual payments called for by the contract into principal and interest at 5 1/2 percent on a declining balance of principal. The Court rejected the assertion that part of each payment constituted interest, but noted at page 246: If the parties had actually adopted such a table as a part of their agreement, it might be pretty strong evidence in support of the petitioner's contention. In the instant case the discount schedule included in the contract and note (being a mathematical parallel of interest at 4 1/2 percent), the treatment of the amount on petitioner's books and all of the circumstances surrounding the final agreement of the parties convince us that interest was intended. Cf. Judson Mills, supra. With respect to respondent's *180 alternative contention that if the total purchase price of $3,240,00 included an element of interest the amount is neither identifiable nor ascertainable, we find that the evidence establishes both the existence and the amount of the interest. The second issue involves the proper allocation of the purchase price of $2,800,000 among the nondepreciable land and the several categories of depreciable assets. In C. D. Johnson Lumber Corporation, 12 T.C. 348, 363, this Court stated the rule that "if the total consideration is paid for a mixed aggregate of assets, its allocation among the several properties acquired should be based upon the relative value of each item to the value of the whole." Such an allocation requires that the several assets be appraised to determine their respective fair market values at the time of acquisition. In his allocation of cost to the various assets respondent takes the figure of $2,800,000 as the maximum cost of all of the assets and, using the so-called residual asset method of allocation, datermines a value of the land of $60 per square foot, or *181 $1,642,800 for the entire tract. From this point respondent's proposed allocation, as described in this brief, is as follows: The second and third asset to be eliminated under the residual asset method are the air conditioners at their new cost of $42,000 and the Eleventh Street buildings at their value of $20,000 which leaves the residue of $1,095,200 to be allocated to the building, building equipment, and the furniture and fixtures. The further allocation to furniture and fixtures should be $182,500 or 20% of the total building value in accordance with the percentage recognized and accepted by hotel men. The allocation of the remainder of $912,700 between the building and the building equipment should be $228,175, or 25% of the total cost to the building equipment and $684,525 or 75% of the total cost to the building frame in accordance with a formula established by a survey and study of a large number of cases involving the separation of building frame and building equipment costs. Respondent's valuation and proposed allocation was made by Glen A. Ruggles, a valuation engineer in the employ of the Internal Revenue Service, who appeared as an expert witness for respondent in *182 this proceeding. He testified that in his valuation and allocation he made no physical examination of the hotel properties and that his valuation of $60 per square foot for the land was based largely on sales of comparable properties in the same general locality at about the time of petitioner's purchase of the property under consideration. Prominent among such sales was that of the McShain property which sold in 1952 for $67 per square foot, and a group of smaller parcels on which the building now occupied by Perpetual Building Association was later constructed. These several parcels of land sold in 1949 and 1950 at an average price of about $78 per square foot. The McShain property is located at the west end of the block, lying across the 12th Street from the Raleigh Hotel. It fronts on 13th Street and extends all the way from Pennsylvania Avenue to E Street and comprises 18,796 square feet. The land was vacant at the time it was purchased in 1952. It was acquired as a site for a modern office building which was later constructed. The Perpetual Building Association property is located on the north side of E Street, between 11th and 12th Streets, directly across E. Street from *183 the Raleigh Hotel square. Ruggles testified that the portion of the Raleigh Hotel property land bordering on 11th Street and occupied by the service building had a value much less than the portion occupied by the main hotel building, probably not more than $25 or $30 per square foot, and that the $60 per square foot valuation was an average for the entire tract. Paul W. Schumacher, who appeared as an expert witness for petitioner, made an appraisal of the hotel properties as of 1953 and an allocation of the costs to the various assets. He made a careful survey of all the property and a visual appraisal of each class of assets. He valued the land at approximately $30 per square foot, or $800,000 for the entire tract, the basic building structure at $1,800,212, the mechanical building equipment at $525,567, the air conditioners at $42,000, and the portable equipment at $498,535. Schumacher, like Ruggles, took into consideration the sale price of the McShain property. He also considered the sale price of the so-called Evening Star property. This latter property is located on the southeast corner of the same block in which the hotel occupies the southwest corner. The Star property *184 sold for a little over $59 per square foot in 1958. We have, however, no basis for allocating this $59 per square foot between the land and the building, for both of which the total price per square foot was paid. Schumacher did not consider the price which Perpetual Building Association had paid for some of the lots in the block immediately north of the hotel property a proper measure of the value of the hotel land. Perpetual began acquiring this property in 1949. It already owned four of the lots and needed the others to fill out the site for its new building. It purchased two more of the lots in 1949, one at $68.61 per square foot and one at $120 per square foot, and two more in 1950 at $61.90 per square foot. These prices undoubtedly reflect the pressure under which Perpetual was operating in acquiring the lots. In arriving at his value of $30 per square foot for the hotel land, Schumacher reasoned that the hotel building did not constitute the most economical use of the land and concluded that the building had, in effect, a negative impact on the land value. He computed this negative impact at 40 percent of the unencumbered land value. The Raleigh Hotel is located near many *185 Government offices, housing, among others, the Internal Revenue Service, the Department of Justice, the Department of Commerce, the Department of Labor, and the Post Office Department. Thus, it is naturally attractive to persons having business with these agencies. Furthermore, the hotel's location on Pennsylvania Avenue places it in close proximity to several national museums. Likewise, it lies on the route of parades between The White House and the nation's Capitol, and not far from many points of historic interest. These factors make it particularly attractive to tourists. While the value of the hotel land cannot be determined with exactness from the evidence of record, we have given careful consideration to the testimony of the expert witnesses and to all of the other evidence bearing on the question of value and have arrived at a value on October 26, 1953, $55of per square foot, or $1,505,900 for the entire tract. We find no reason to question or amend the values of the other assets acquired, as determined by Schumacher. He seemed to have made a careful appraisal of all of those assets and to have used sound judgment in his valuations. Accordingly, we find that the other *186 land and other assets had the following values as of the date of purchase by petitioner in 1953: Land
$1,505,900
Basic building structure
1,800,212
Mechanical building equipment
525,567
Window air conditioners
42,000
Portable equipment (furniture
and fixtures)
498,535
Total
$4,372,214
The purchase price of $2,800,000 should be allocated according to the relative value of each asset or class of assets to the value of the whole. The third issue involves the deductibility by petitioner of interest accrued on the alleged loan to it by its sole stockholder at about the time petitioner acquired the hotel property. This is essentially a factual question upon which petitioner bears the burden of establishing that a true indebtedness was intended and created. John Kelley Co. v. Commissioner, 326 U.S. 521. The burden on petitioner is particularly significant where, as in the instant case, there is an identity of creditor and stockholder. Petitioner relies primarily on the formal characteristics of the note and the treatment of the transaction as a loan by Massaglia and on petitioner's books. Respondent points out that the ratio of debt to *187 equity of petitioner as of December 1, 1953, was about 127 to 1, the total investment in capital stock being just $25,000; that the amount advanced as purported indebtedness was approximately equal to the cash down payment required under the contract of sale by which petitioner acquired the hotel assets; and that the note was not secured. Of a total purchase price of $2,800,000, indebtedness secured by first and second mortgages totalled more than $2,680,000. Moreover, while the original note had a fixed maturity, January 1, 1956, it was replaced at its maturity by another note which contained neither a fixed nor determinable maturity. In addition, it was not until about two months after the advance was made by Massaglia that he requested a note from petitioner as evidence of this indebtedness. Whether true indebtedness exists is to be determined upon the basis of whether true indebtedness was intended by the parties. Unitex Industries, Inc., 30 T.C. 468, affd. 267 F. 2d 40 (C.A. 5, 1959). Massaglia, who made the advances and who was the sole stockholder of *188 petitioner, did not appear as a witness. The immediate cash requirements of petitioner were in excess of $500,000, yet the total contribution earmarked for stock was only $25,000. Petitioner has offered no evidence to prove that the initial equity investment was sufficient to finance the corporate business. The bare record indicates that quite the contrary is true. While we will not disregard the existence of a note fair on its face or the treatment of the advances as an indebtedness by both petitioner and Massaglia, such evidence is inadequate herein to establish that petitioner is entitled to the deductions claimed. We are satisfied that these unsecured advances were subject to the risks of the business; that they constituted a part of the original equity investment of Massaglia; and that they were debts of petitioner in form only. Accordingly, we hold that petitioner is entitled to no interest deduction for the years before us with respect to these advances. The addition to tax asserted by respondent for petitioner's failure to file timely its income tax return for the fiscal year ending Octber 31, 1955, was disputed in the petition. Petitioner, however, offered no evidence *189 on this issue at the trial. The return, with extensions, was due April 15, 1956. The record discloses that it was not filed until April 4, 1957. There is no showing that the failure timely to file the return was due to reasonable cause. Accordingly, respondent's determination on this issue is sustained. Decision will be entered under Rule 50. Footnotes
1. The figure $3,240,000 appears in the contract of sale. The figure $3,241,943.23 apparently reflects certain minor adjustments made by the examining agent in this case. With respect to the issues before us, the figure $3,240,000 is material.↩