THOMAS R. SUTHERLAND AND SALLY L. SUTHERLAND, Petitioners, v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Sutherland v. Commissioner
Docket No. 10776-88
United States Tax Court
T.C. Memo 1991-619; 1991 Tax Ct. Memo LEXIS 666; 62 T.C.M. (CCH) 1533; T.C.M. (RIA) 91619; December 12, 1991, Filed *666 Decision will be entered for the respondent. Melvin Friedman, for the petitioner Thomas R. Sutherland. Richard F. Stein, for the respondent. KORNER, Judge
KORNER
MEMORANDUM FINDINGS OF FACT AND OPINION By statutory notice of deficiency dated March 23, 1988, respondent determined deficiencies in and additions to petitioners' Federal income tax as follows: Additions to Tax
Year
Deficiency
Sec. 6651(a)(1) [1]
Sec. 6661
1982
$ 11,390
-- $ 2,848
1983
3,767
$ 565
-- 1984
3,915
75
-- Following a concession by petitioner, the remaining issues are: (1) Whether petitioners are entitled to business bad debt deductions for 1982, 1983, and 1984; (2) whether petitioners are liable for additions to tax pursuant to section 6651(a)(1) for 1983 and 1984; and (3) whether petitioners are liable for an addition to tax under section 6661 for 1982. *667 FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and the accompanying exhibits are incorporated herein by this reference. Petitioner Thomas R. Sutherland and petitioner Sally L. Sutherland (Ms. Sutherland) resided in the State of Virginia at the time the petition in this case was filed. "Petitioner" shall refer to Thomas R. Sutherland. Petitioners are calendar year taxpayers. Petitioners filed a timely joint income tax return for 1982. Although petitioners' filing date for their 1983 income tax return was automatically extended to August 15, 1984, their return for that year was not filed until October 22, 1984. Petitioners were granted two extensions of time to file their 1984 income tax return. The second extension expired on October 15, 1985, and petitioners filed their 1984 joint income tax return on November 14, 1985. Petitioner was employed full-time as a pilot for Piedmont Aviation, Inc., during the years at issue, and had been involved in several business ventures during the 1970's. Petitioners' tax returns, for the years at issue, listed Ms. Sutherland's occupation as either housewife or homemaker. In March of *668 1979, petitioner, Michael W. McQuillis (McQuillis) and J. Austin Cain (Cain) formed a corporation called Nags Head, Ltd. (Nags Head), to own and operate a restaurant/nightclub in Nags Head, North Carolina, known as Atlantis. Petitioner paid $ 245 for 245 shares in Nags Head, which shares constituted a 24.5-percent ownership interest in the corporation. McQuillis and Cain owned 51 percent and 24.5 percent of Nags Head, respectively. The total capital stock of the corporation was $ 1,000. Nags Head elected S corporation status, and filed its returns on the basis of the calendar year. On or around April 1979, Nags Head leased the premises on which Atlantis was located from Edward Ruffin (Ruffin), a friend of McQuillis. Nags Head paid for leasehold improvements to the property in the amount of $ 58,761.60. The corporation acquired $ 26,604.23 worth of equipment during the summer of 1979 to complement the equipment already on the premises. Atlantis opened in May 1979. Atlantis' business was seasonal, generating most of its income during the summer months. When petitioner had time off from his employment with Piedmont Aviation, he would assist in operating Atlantis, doing "whatever *669 needed to be done." He was not compensated for the work he performed. Petitioner advanced funds to Nags Head during the summer of 1979 to cover some of the capital costs and operating expenses of the nightclub. In return for the advances, the corporation issued two unsecured notes payable to petitioner, one dated September 1, 1979, in the face amount of $ 26,000, and another dated September 30, 1979, in the face amount of $ 16,700. Each note was executed by Cain, as vice president of Nags Head. The first note called for nine payments of $ 2,888.88 with a payment due in each of the months of June, July, and August of 1980, 1981, and 1982. Interest accrued at 10 percent per annum. [2] The second note called for three equal payments due on September 30 of 1980, 1981, and 1982, and interest on this note accrued at 12 percent per annum. In October 1979, Nags Head borrowed $ 18,000 from Wachovia Bank and Trust Company, an unrelated third party. This loan was secured and accrued interest at a variable rate of 1-1/2 percent over the bank's prime rate. The initial rate of interest on this loan was 16.5 percent, and the note was eventually paid off. *670 On its U.S. Small Business Corporation Income Tax Return (Form 1120S) for 1979, Nags Head reported shareholder loans in the amount of $ 89,231.35, and notes payable to nonshareholders in the amount of $ 37,542.20. Entries in Nags Head's corporate books revealed that as of December 31, 1979, the corporation owed $ 37,426.32, $ 21,697.28, and $ 30,107.75 to McQuillis, Cain, and petitioner, respectively. The corporation reported total assets as of the end of 1979 of $ 86,656.30 and liabilities in the amount of $ 159,568.18. Nags Head reported a $ 73,256.50 loss for 1979, and petitioners' share of the loss was $ 17,947.85. Petitioner and the other shareholders disagreed as to the "business practices" of the enterprise around the end of the summer of 1979. Petitioner testified that he was later forced to leave the corporation, because Ruffin threatened not to renew the lease. [3] Subsequently, he attempted to collect the advances he had made to Nags Head. His attorney, Seymour M. Teach (Teach), made several telephone calls to the corporation and forwarded a demand letter for $ 21,000 to Nags Head on December 12, 1982. After having received no response from Nags Head, Teach, on or *671 about January 4, 1983, advised petitioner that the "debt" was uncollectible. Nags Head had assets and cash in the bank at the time the demand letter was sent. Records of the North Carolina State Corporation Commission reveal that Nags Head remained an active corporation until February 21, 1986. [4]
Petitioners reported business bad debt losses from petitioner's advances to Nags *672 Head, fully deductible in the amounts of $ 27,797, $ 8,622, and $ 11,447 in 1982, 1983, and 1984, respectively. Respondent determined that petitioners had not established that they were entitled to the reported bad debt losses for the years at issue. Respondent further determined that section 6661 applied to the deficiency for 1982, and that petitioners were liable for additions to tax under section 6651(a)(1) for both 1983 and 1984. Respondent also disallowed $ 1,424 in miscellaneous itemized deductions for 1982, which issue petitioner conceded at trial. Petitioner filed the petition in this case on behalf of Ms. Sutherland and himself on May 19, 1988. Ms. Sutherland ratified and affirmed the petition by amendment thereto on August 22, 1988. Neither Ms. Sutherland nor anyone acting as her representative appeared at trial, nor did she submit a brief. OPINION 1. Bad Debt
We must decide whether the advances extended by petitioner to Nags Head in 1979 constituted bona fide debt which became worthless in 1982, 1983, and 1984. If petitioners are entitled to bad debt deductions for the years at issue, we must then determine whether the debt constituted business debt deductible *673 under section 166(a)(1) or nonbusiness bad debt deductible under section 166(d). Based on the record, we are unable to find that the advances were debt, or that the advances, if debt, became worthless as reported by petitioners for each of the years at issue. A. Debt or Equity
Whether the advances were debt depends on whether the parties intended to "establish an unconditional obligation to repay the advances." Road Materials, Inc. v. Commissioner, 407 F.2d 1121, 1124-1125 (4th Cir. 1969), affg. a Memorandum Opinion of this Court. See also Mills v. Internal Revenue Service, 840 F.2d 229 (4th Cir. 1988), revg. a Memorandum Opinion of this Court (reversing on the facts, not law); [5]Gilbert v. Commissioner, 74 T.C. 60 (1980). "A bona fide debt is a debt which arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money. * * * A gift or contribution to capital shall not be considered a debt for purposes of section 166." Sec. 1.166-1(c), Income Tax Regs.
*674 In the absence of arm's-length dealing, "form does not necessarily correspond to the intrinsic economic nature of the transaction, for the parties may mold it at their will with no countervailing pull." Fin Hay Realty Co. v. United States, 398 F.2d 694, 697 (3d Cir. 1968). Particularly in the context of a close corporation, intention to create a debt depends "upon weighing such objective factors as reasonable expectation of repayment and the economic reality of the claimed debtor-creditor relationship." Gilbert v. Commissioner, supra at 65. However, no single factor or set of factors is determinative, John Kelley Co. v. Commissioner, 326 U.S. 521, 530, 90 L. Ed. 278, 66 S. Ct. 299 (1946), and each case must be resolved on its own set of facts. Mills v. Commissioner, supra at 235. Relevant factors include: the names given to the certificates evidencing the indebtedness; presence or absence of a fixed maturity date; source of payments; right to enforce payments; participation in management as a result of the advances; status of the advances in relation to regular corporate creditors; intent of the parties; identity *675 of interest between creditor and stockholder; "thinness" of capital structure in relation to debt; ability of corporation to obtain credit from outside sources; use to which advances were put; failure of debtor to repay; and risk involved in making the advances. [Dixie Dairies Corp. v. Commissioner, 74 T.C. 476, 493 (1980).]
The burden is on petitioners to establish that the advances constituted debts. Welch v. Helvering, 290 U.S. 111, 78 L. Ed. 212, 54 S. Ct. 8 (1933); Jewell Ridge Coal Corp. v. Commissioner, 318 F.2d 695 (4th Cir. 1963), affg. a Memorandum Opinion of this Court; Dixie Dairies Corp. v. Commissioner, supra; Rule 142(a). Based on the record, petitioner has failed to sustain his burden that the advances represented debt and not equity. Several factors appear to speak in favor of characterizing the advances as loans. Two notes allegedly memorialized the advances, and the corporate ledgers of Nags Head for 1979 and 1980 included entries describing petitioner's advances as loans. Furthermore, the notes specified both payment dates and amounts, and they did not restrict the right of petitioner to enforce payment. *676 In this respect, petitioner did attempt (although faintly) to enforce payment through his attorney. In addition, petitioner testified that it was his intent that the advances be loans and not contributions to capital, and his participation in the management of the corporation apparently did not increase. However, "consistent bookkeeping and consistent financial reporting on balance sheets are in our opinion little more than additional declarations of intent, without any accompanying objective economic indicia of debt." Alterman Foods, Inc. v. United States, 505 F.2d 873, 879 (5th Cir. 1974). Although petitioner may have been forced to "leave" Nags Head, nonetheless, one would have expected that the corporation would have made some of the payments, in 1980 at least, if the advances were truly debt. Petitioner, however, adduced no evidence that any of the payments or interest on the debt had been paid. [6] Nor did petitioner take action to enforce payment until the end of 1982. Moreover, the notes payable to petitioner were unsecured and were subordinate to a subsequent third-party loan from Wachovia Bank and Trust Company, which loan was secured and initially *677 accrued interest at 16.5 percent. The apparent lack of compliance with the terms of the notes and the inability of Nags Head to obtain loans on similar terms from other lenders suggest that the amounts in question represented equity and not debt. Road Materials v. Commissioner, supra; Wachovia Bank and Trust Company v. United States, 288 F.2d 750 (4th Cir. 1961). Also, petitioner's assertion of intent to have the advances constitute debt is not determinative of the issue. Uneco, Inc. v. United States, 532 F.2d 1204, 1209 (8th Cir. 1976) (objective factors are to be considered along with subjective intent to determine the character of an advance); Road Materials v. Commissioner, supra at 1124 (contemporaneous facts, and not testimony, generally establish the nature of an advance).
*678 Several other factors indicate that the advances represented equity. First, the source of repayments for the advances would come from the future success of the corporation, thus placing the advances at the risk of the venture. The dependance of repayment on the financial success of the corporation suggests that an advance constitutes equity. Affiliated Research, Inc. v. United States, 173 Ct. Cl. 338, 351 F.2d 646, 648 (1965). This case is unlike Baker Commodities, Inc. v. Commissioner, 48 T.C. 374, 398 (1967), affd. 415 F.2d 519, (9th Cir. 1969), where this Court held that notes represented debt in part because payments on the note were to come from the "continued success of a well-established business which enjoyed not only a good past earnings' record but equally good prospect for the future." Here, the advances were made at or near the inception of the venture undertaken by Nags Head, and the notes were unsecured. Moreover, petitioner failed to adduce objective evidence that would establish that the past earnings record of the nightclub provided a reasonable expectation repayment. Instead these facts support *679 respondent's contention that petitioner, with respect to the advances he made to the corporation in 1979, was a stockholder, who "intends to embark upon the corporate adventure, taking the risks of loss attendant upon it that he may enjoy the chances of profit," and not a creditor, who "does not intend to take such risks so far as they may be avoided but merely to lend his capital to others who do intend to take them." Richmond v. Helvering, 90 F.2d 971, 974 (4th Cir. 1937), affg. 33 B.T.A. 895 (1936). Second, the advances were used by Nags Head to provide Atlantis with its initial working capital. Where a corporation has not demonstrated profitability, the use of a shareholder loan "for the purchase of capital assets and for meeting the expenses needed to commence operations" is indicative of a capital contribution. Henderson v. United States, 375 F.2d 36, 40 (5th Cir. 1967); Segel v. Commissioner, 89 T.C. 816, 831 (1987). Although Atlantis may have been operated by other persons prior to Nags Head ownership, petitioner has failed to establish its prior financial history. Furthermore, the record indicates *680 the advances were used to pay for renovations required to operate the restaurant and to acquire equipment, as well as to meet operating expenses during the summer of 1979. Third, Nags Head's high debt/equity ratio supports capital characterization. Although thin capitalization does not by itself determine the issue of whether an advance is debt or equity, it provides strong evidence of equity where other factors also point in the same direction. Curry v. United States, 396 F.2d 630 (5th Cir. 1968); Henderson v. United States, supra.The purpose underlying this factor is that repayment of an unsecured loan to a thinly capitalized corporation is unlikely were the corporation to suffer business losses. Gilbert v. Commissioner, 248 F.2d 399, 407 (2d Cir. 1957), remanding a Memorandum Opinion of this Court (case remanded for clarification of factual support for several holdings). The shareholders of Nags Head contributed in total $ 1,000 for capital stock upon its formation in early 1979, and Nags Head reported $ 73,256.50 in losses in 1979. At the end of 1979, shareholder loans totaled $ 89,231.35, third-party loans *681 $ 37,532.00, and accounts payable $ 32,804.63. Thus, Nags Head's debt to equity ratio at the end of 1979 was substantial by any measure, whether the numerator is determined by reference to shareholder debt, or to the total liabilities of the corporation. Wood Preserving Corp. v. United States, 347 F.2d 117, 120 (4th Cir. 1965) (numerator is shareholder debt); Dixie Dairies Corp. v. Commissioner, supra at 497 (ratio determined using both shareholder debt and total liabilities as numerator). Given the other factors that favor equity characterization, Nags Head's high debt/equity ratio, which appears to be without business purpose, Byerlite Corp. v. Williams, 286 F.2d 285, 293 (6th Cir. 1960), supports the conclusion that the advances constituted equity. Fourth, petitioner was not the only shareholder to have advanced funds to the corporation. To the extent that advances are substantially in proportion to the shareholders' equity interest, the advances indicate a sharing of financial risk. Affiliated Research, Inc. v. United States, supra at 650. See also Segel v. Commissioner, supra. *682 Here, McQuillis and Cain had, according to the corporate books, extended loans in the amounts of $ 37,426.32 and $ 21,697.28, respectively, to Nags Head in 1979. The corporate books also show that Nags Head owed petitioner $ 30,107.75 at the end of 1979 (as well at the end of 1980). Based upon the corporate ledgers, petitioner's share of the shareholders' debt was 34 percent, McQuillis' share 42 percent, and Cain's share 24 percent. The outstanding debt owed to each of the shareholders at the end of 1979 was not so far out of proportion to their equity ownership that it militates against the characterization of the advances as equity. Based upon the entire record and after considering petitioner's arguments, we hold that petitioner has failed to sustain his burden of proving that the advances were debt. B. Worthlessness of Debt
Even if we were to conclude that the advances were loans, petitioners would not be entitled to deduct such amounts as bad debts, since they have failed to establish that the debts were worthless in the years and in the amounts claimed. See sec. 166(a)(1); Rule 142(a). To be entitled to a bad debt deduction under section 166(a)(1), a taxpayer must *683 show that the debt became wholly worthless in the year in which it is claimed. Millsap v. Commissioner, 46 T.C. 751 (1966), affd. 387 F.2d 420 (8th Cir. 1968). Worthlessness is a question of fact. Sec. 1.166-2(a), Income Tax Regs. A debt becomes worthless "in the year in which identifiable events clearly mark the futility of any hope of further recovery thereon." James A. Messer Co. v. Commissioner, 57 T.C. 848, 861 (1972). Petitioners bear the burden of proving the worthlessness of debt in the year it is claimed. Perry v. Commissioner, 22 T.C. 968, 973 (1954). Petitioner claimed business bad debt deductions of $ 27,797, $ 8,622, and $ 11,747 in 1982, 1983, and 1984, respectively. Petitioner asserts that he was entitled to such deductions after Teach, his attorney, advised him in early 1983 that it was unlikely he would collect his debt from Nags Head. Teach did not testify and apparently based his conclusion on the fact that the corporation had failed to respond to telephone calls and a letter demanding repayment of $ 21,000. However, "mere failure to pay on demand is not proof of the worthlessness *684 of a debt." Prescott State Bank v. Commissioner, 11 B.T.A. 147, 148 (1928). Furthermore, petitioner testified that he had determined that Nags Head had assets and cash in 1982, and that it remained a "viable" corporation until 1986 when its name was changed. These circumstances do not establish the futility of any further attempts to recover the alleged debts. In addition, we note that petitioner failed to present any evidence as to why the bad debt deductions arising from his advances to Nags Head were spread over three years. [7] We find that petitioner failed to sustain his burden that the advances became worthless in any of the years at issue. [8]
*685 2. Section 6651(a)(1)
If a taxpayer fails to file a timely income tax return, an addition to tax of 5 percent per month of the amount of tax required to be shown on the return shall be imposed, unless the taxpayer is able to show that such failure was due to reasonable cause and not willful neglect. Sec. 6651(a)(1). Petitioners bear the burden of proving that their failure to file a timely return was due to reasonable cause and not willful neglect. Baldwin v. Commissioner, 84 T.C. 859, 870 (1985). Petitioners' 1983 joint income tax return was filed on October 22, 1984, and petitioners' 1984 tax return was filed on November 14, 1985. For both years petitioners had obtained extensions to file their returns; however, in each year the extension(s) had expired by the time their return was filed. Petitioner claims that he had mailed the 1983 joint income tax return prior to the expiration of the automatic extension to file on August 15, 1984, but adduced no objective evidence in support of his contention. However, respondent presented evidence that the return had been received by the Internal Revenue Service on October 22, 1984, over 2 months after the *686 expiration of the extension to file. In these circumstances, we sustain respondent's determination on this issue for this year. Petitioner claims that the joint income tax return for 1984 was filed late because he had become separated from his wife and she was unable to sign that return until after the second extension to file for 1984 had expired on October 15, 1985. Other than his testimony regarding the filing of the 1984 return, petitioner did not further substantiate his entitlement to an exception to this addition to tax. Petitioner failed to adduce evidence showing why other means of obtaining Ms. Sutherland's signature, such as forwarding the return to her prior to the expiration of the second extension to file, was impossible or not practicable. Although under certain circumstances the failure to obtain a spouse's signature might provide reasonable cause for failure to timely file, we hold that the record, in this case, does not sustain an exception. 3. Section 6661(a)
Section 6661(a) imposes an addition to the tax equal to 25 percent of the amount of any underpayment attributable to a substantial understatement of income tax. An understatement of tax is substantial *687 if it exceeds the greater of $ 5,000 or 10 percent of the tax required to be shown on the tax return. Sec. 6661(b)(1)(A). Understatement for purposes of section 6661(a) means the excess of the amount of tax required to be shown on the return over the amount which is shown on the return. Sec. 6661(b)(2)(A). The amount of the understatement is reduced by the portion of the understatement attributable to an item for which the taxpayer is able to show that there is substantial authority for the tax position taken, or to an item for which the taxpayer adequately disclosed the relevant facts affecting the item's tax treatment in the return or in a statement attached to the return. Sec. 6661(b)(2)(B). Respondent determined that petitioners were liable for an addition to tax pursuant to section 6661(a) for 1982. Petitioners bear the burden of proof with respect to this issue. Rule 142(a). Having sustained respondent's determination with respect to the bad deduction for 1982 and given petitioner's concession with respect to respondent's disallowance of certain miscellaneous deductions, petitioners' understatement of income tax is substantial for the year at issue. Moreover, petitioner *688 did not present substantial authority for the tax position he took with respect to the bad debt deduction and miscellaneous deductions for 1982, see section 6661(b)(2)(B)(i), nor did he offer any evidence that the relevant facts, regarding these deductions, had been adequately disclosed as provided in section 6661(b)(2)(B)(ii). See Schirmer v. Commissioner, 89 T.C. 277 (1987). In light of these circumstances, we hold that petitioners have failed to sustain their burden with respect to this issue. See Rule 142(a). Decision will be entered for the respondent. Footnotes
1. All statutory references are to the Internal Revenue Code as in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, except as otherwise noted.↩
2. The note, on its face, is ambiguous regarding whether the payments did or did not include interest. If nine payments of $ 2,888.88 had been made, petitioner would have been paid a total of $ 25,999.92. In effect, petitioner would have received no interest. However, petitioner testified that the terms of the note, as he understood them, were that, in addition to the nine payments, he would be paid interest on the balance due.↩
3. The record is unclear as to when petitioner left the corporation, and, for that matter, what constituted leaving the corporation. In any event, petitioners did report their share of Nags Head 1980 income in the amount of $ 2,045 on their 1980 joint income tax return.↩
4. Whether Nags Head continued to operate Atlantis after 1980 cannot be determined from the record. Petitioner testified to the effect that Atlantis kept operating and eventually changed its name, but did not disclose its relationship to Nags Head during the years following 1980. ↩
5. The instance case is appealable to the United States Court of Appeals for the Fourth Circuit.↩
6. We note that Nags Head's notes payable to petitioner total $ 42,700, and that petitioners claimed bad debt deductions over the years in issue in the total amount of $ 47,896. No explanation was offered by petitioner to account for this difference. Nor did petitioner explain why the amount of the notes differed from the amounts disclosed by the corporation's books as owing petitioner at the end of 1979. Petitioner also failed to explain why his attorney demanded only $ 21,000 from Nags Head, when petitioner maintained that no payments had been made on the two notes. Respondent does not dispute that advances were made by petitioner to Nags Head, although he leaves it to petitioners to establish their amount and character.↩
7. Even if petitioner were relying on sec. 166(a)(2), the partial bad debt provision, to support his bad debt deduction for the years at issue, he has failed to show that the debts were not recoverable in part in each of the years at issue, and that respondent had abused his discretion in denying the partially bad debt deductions. Austin Co. v. Commissioner, 71 T.C. 955, 971↩ (1979).
8. As a result of our holdings in this case, we need not determine either the amount of the advances which remained outstanding during the years at issue, nor whether the advances, if debt, constituted business or nonbusiness debt. Furthermore, petitioner did not raise the issue that he was entitled to a deduction under sec. 165(g) (concerning worthless securities) for any of the years at issue.↩