T.C. Memo. 1998-423


UNITED STATES TAX COURT


CERAND & COMPANY, INC., Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 2767-97.                    Filed November 24, 1998.


Gerard A. Cerand (an officer), for petitioner.

Gregory S. Matson and Warren P. Simonsen, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

GERBER, Judge:  Respondent determined deficiencies in

petitioner's Federal income tax for tax years 1990, 1991, and

1992 in the amounts of $6,994, $10,709, and $143,406,

respectively.  The issue for our consideration is whether bad

debt deductions taken in 1990 and 1991 are allowable under

section 166.[1] The remainder of respondent's determination, the 1992 net operating loss (NOL) carryforward and a charitable gift deduction, is purely computational adjustments caused by the reduction of petitioner's ordinary loss deduction and the corresponding increase in income.

Respondent contends that the extension of credit to corporations wholly owned by petitioner's sole shareholder constituted equity investments in those companies. As such, respondent argues that the corporations' subsequent failures resulted in capital rather than ordinary losses for petitioner. Petitioner counters that the lines of credit were valid debt incurred by the corporations, and the corporations' inability to repay the debt created an ordinary loss for petitioner under section 166.

FINDINGS OF FACT

The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference.

Petitioner Cerand & Company, Inc., offers consulting services concerning the operation of airport parking lots. Petitioner was located in Washington, D.C., at the time the petition in this case was filed. Petitioner's president is

---

[1] Unless otherwise stated, all section references are to the Internal Revenue Code in effect for the taxable years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

Gerard A. Cerand, who held 95 percent of the stock until 1989 when he became petitioner's sole shareholder.

Because petitioner's consulting business involved extensive travel to airports with varying accessibility throughout the United States, Mr. Cerand needed certain air taxi/charter services. In 1984, responding to this need, he formed three new corporations, First World Corp. (FWC), Cerand Aviation (CAI), and Airport Service Corp. (ASC), based in Culpeper County, Virginia. These separate corporations had a business purpose: to allow petitioner greater growth while limiting any potential catastrophic liability to petitioner in the event of an aviation accident. Mr. Cerand was the president and owner of the three new corporations, although no stock was ever issued.

The three new companies and petitioner were intertwined. FWC provided administrative services to CAI and ASC, such as labor, employee health benefits, and insurance. CAI provided the air taxi/charter service to petitioner and other outside clientele, as well as providing aviation instruction to outside clientele. ASC provided the aviation support services.

Petitioner provided working capital to these companies through an "open account receivable", or line of credit, on which the three corporations consistently drew advances. Petitioner paid a total of $1,413,374.17 to FWC, CAI, and ASC from 1984 until 1991. No formal loan agreements or notes were drawn up,

nor was any repayment schedule set.  From time to time, the three corporations made cash repayments, or book entry credit was made to the advances for services rendered to petitioner.  While the corporations were viable, they repaid $414,220 to petitioner. Petitioner accrued interest only sporadically on the advances to two of the corporations and failed to accrue any interest against the advances to the third, contrary to the advice of Mr. Cerand's tax adviser.  The interest that petitioner did accrue on its books was rolled over annually into a note receivable and reported as income by petitioner.  Because that income was never actually received by petitioner, respondent has allowed a deduction against ordinary income for that amount.

The three corporations used funds received from petitioner to pay operating expenses.  No capital assets were purchased by the corporations.  Instead, all assets were leased, primarily from Mr. Cerand.

In 1989, the corporations experienced two costly and devastating events, the loss of FWC's lease for ASC's operations at Culpeper County Airport and the loss of CAI's Government contract comprising approximately 90 percent of its business. These events caused the demise of CAI and ASC in 1990, with FWC close behind in 1991.

Once the companies went out of business, there were no assets to seize as repayment, except for a key man life insurance

policy on Mr. Cerand held by FWC with $160,859 cash surrender value.  Petitioner recovered the cash surrender value and reported the income as a debt reduction.  No further attempts were made to secure payment from the three defunct corporations.

In 1990, petitioner claimed a bad debt deduction for the unpaid balances of ASC and CAI.  In 1991, petitioner claimed a bad debt deduction for FWC's unpaid balance.  In 1992, petitioner claimed an NOL carryforward that was generated by the bad debt claims.  Respondent disallowed the following bad debt deductions as ordinary losses, determining that they were capital losses.

|                           | 1990      | 1991      |
|---------------------------|-----------|-----------|
| Cerand Aviation, Inc.     | $174,760  | ---       |
| Aviation Services Corp.   | 43,331    | ---       |
| First World Co., Inc.     | ---       | $681,112  |
| Total                     | 218,091   | 681,112   |

Respondent asserts that the funds advanced by petitioner were actually capital contributions to equity rather than debt.  If the bad debt deductions are not allowed as ordinary losses, then the 1992 NOL carryforward is not allowable, and a previously unavailable charitable deduction would be allowed.

OPINION

The sole adjustment under consideration involves the question of whether petitioner is entitled, under section 166, to business bad debt deductions for 1990 and 1991 due to the failure of FWC, CAI, and ASC to repay advances made by petitioner.  All other adjustments depend on the outcome of this primary issue.

Section 166 provides for deductions against ordinary income for business bad debts that become worthless during the year. To be entitled to the deduction, the taxpayer must prove a bona fide debtor-creditor relationship obligating the debtor to pay the creditor-taxpayer a fixed or determinable sum of money. Calumet Indus., Inc. v. Commissioner, 95 T.C. 257 (1990). Contributions to capital are not considered debt. Kean v. Commissioner, 91 T.C. 575, 594 (1988); sec. 1.166-1(c), Income Tax Regs. The classification of a payment as debt or equity for Federal tax purposes is a question of fact. Segel v. Commissioner, 89 T.C. 816, 827 (1987).

The fact that the debtor and creditor are related parties does not preclude the existence of a bona fide debt. Calumet Indus., Inc. v. Commissioner, supra at 286. However, the form of the transaction and the labels parties place on the transaction may not have as much significance when the corporation is closely held because the parties are free to mold the transaction. Fin Hay Realty Co. v. United States, 398 F.2d 694, 697 (3d Cir. 1968). For this reason, petitioner's characterization of the fund transfer as an open account receivable is not determinative.

In resolving similar questions of debt versus equity, various appellate courts have identified and considered similar factors. See, e.g., Estate of Mixon v. United States, 464 F.2d 394, 402 (5th Cir. 1972) (13 factors); A.R. Lantz Co. v. United

States, 424 F.2d 1330 (9th Cir. 1970) (11 factors); Fin Hay Realty Co. v. United States, supra (16 factors); Georgia-Pacific Corp. v. Commissioner, 63 T.C. 790 (1975) (13 factors). The factors considered include: (1) The names given to the certificates evidencing the indebtedness; (2) presence or absence of a fixed maturity date; (3) source of payments; (4) right to enforce payments; (5) participation in management as a result of the advances; (6) status of the advances in relation to regular corporate creditors; (7) intent of the parties; (8) identity of interest between creditor and stockholder; (9) "thinness" of capital structure in relation to debt; (10) ability of corporation to obtain credit from outside sources; (11) use to which advances were put; (12) failure of debtor to repay; and (13) risk involved in making advances. Dixie Dairies Corp. v. Commissioner, 74 T.C. 476, 493-494 (1980).

The identified factors are not equally significant. Estate of Mixon v. United States, supra at 402. Nor is any one factor determinative or relevant in each case due to the countless factual circumstances possible. John Kelley Co. v. Commissioner, 326 U.S. 521, 530 (1946). "The various factors * * * are only aids in answering the ultimate question whether the investment, analyzed in terms of its economic reality, constitutes risk capital entirely subject to the fortunes of the corporate venture or represents a strict debtor-creditor relationship." Fin Hay

Realty Co. v. United States, supra at 697.  The ultimate question is whether there was a genuine intention to create a debt, with a reasonable expectation of repayment, and if that intention comported with the economic reality of creating a debtor-creditor relationship.  Litton Bus. Sys., Inc. v. Commissioner, 61 T.C. 367, 377 (1973).

Applying the relevant factors to the present facts, it becomes evident that petitioner did not intend to establish a debtor-creditor relationship with FWC, CAI, and ASC.  Instead, the contributions made by petitioner were in actuality equity investments in the common owner's companies.

First, we look at the particulars of the transaction, including the name given to the certificates of debt and the presence or absence of a maturity date or a repayment schedule to indicate debt or equity.  Petitioner never used any certificate or instrument to memorialize the debt; no loan agreements or notes were ever signed.  Nor did petitioner set a fixed maturity date or a repayment schedule for the three companies.  The absence of a maturity date on a note weighs against finding that the transfers were loans.  Stinnett's Pontiac Serv. Inc. v. Commissioner, 730 F.2d 634, 638 (11th Cir. 1984), affg. T.C. Memo. 1982-314.  Moreover, petitioner failed even to show that a predetermined interest rate applied or that the interest accrued on the advances was at market rate.  See Rule 142(a) (petitioner

has the burden of proof unless otherwise provided by statute or the Court).

Second, the payments themselves may denote the nature of debt or equity. The source, the consistency, and the enforcement of repayment are factors to consider. The repayment to petitioner was inconsistent and appeared dependent on financial success. Accordingly, the source of the repayment was more like equity rather than debt. Moreover, while petitioner insists that there was a right to enforce payments from the three companies, petitioner never made any efforts to do so beyond recovering the cash surrender value of FWC's life insurance policy on Mr. Cerand.

The third group of factors are those factors traditionally considered by lenders, such as capitalization, risk, the availability of financing from outside sources and the use to which advances are put. "[T]he touchstone of economic reality is whether an outside lender would have made the payments in the same form and on the same terms." Segel v. Commissioner, supra at 828. The three new companies were thinly capitalized, with no capital assets, and more than $1.4 million was advanced over time to meet operating expenses. With thin capitalization and no historical success, there was considerable risk in advancing the funds. That risk became reality when the three companies failed to repay over two-thirds of the money they received from

petitioner before going out of business.  Though no outside financing was sought, it is reasonable to assume that an outside financier would not have accepted similar credit terms:  an open, unsecured line of credit with no set interest rate, no set payment schedule, and no fixed maturity date to three companies with no financial history and no capital assets.

As shown by their actions, the parties intended the funds advanced to be an investment in FWC, CAI, and ASC.  For these reasons, we find that petitioner made an equity investment in FWC, CAI, and ASC.  When the three failed to repay petitioner the funds it had extended, petitioner suffered a capital loss.

In light of the foregoing,

Decision will be entered under Rule 155.