T.C. Memo. 1999-386

UNITED STATES TAX COURT

EDWIN A. HELWIG, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 1069-98.                    Filed November 29, 1999.

<u>Martin A. Shainbaum</u> and <u>David B. Porter</u>, for petitioner.

<u>Dale A. Zusi</u> and <u>Michael F. Steiner</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GERBER, <u>Judge</u>:  In a notice of deficiency addressed to petitioner and Barbara G. Helwig,[1] respondent determined income tax deficiencies as follows:

---

    [1] Petitioner and Barbara G. Helwig filed a joint petition, but Barbara G. Helwig's cause of action was severed from that of petitioner.

| Year | Amount |
|------|--------|
| 1990 | $57,405 |
| 1991 | 178,902 |
| 1992 | 132,150 |
| 1993 | 142,110 |

The amounts remaining in controversy, in great part, derive from questions about whether petitioner's S corporation's claimed deductions for losses and interest are allowable. In particular, the controversy involves whether advances from the S corporation to a second corporation constitute debt or equity. If the advances are held to be debt, then we must decide whether it was business debt and whether it became worthless as claimed. We also decide whether petitioner is entitled to deduct interest paid on indebtedness incurred to purchase a yacht.

## FINDINGS OF FACT[2]

Petitioner resided and/or conducted business in the State of California, at the time his petition was filed. During the years in issue, petitioner was the sole shareholder of K&H Finishing, Inc. (K&H), an S corporation. In 1966, K&H began providing painting services to computer manufacturers in the Silicon Valley, California, area. As the business matured and through the years before the Court, K&H would purchase and inventory parts, assemble and finish them, and then sell and deliver them to the manufacturer/customer. Although K&H did not place the

---

[2] The parties' stipulations of facts and exhibits are incorporated by this reference.

computer components into the enclosures it painted, occasionally, K&H installed electric wiring or cable into the enclosures.

By the early 1990's, K&H's contracts were becoming larger, but the industry was also becoming more competitive, and the type of computer enclosure was changing to molded materials that did not require painting, thus reducing the need for K&H's services. As of 1990, K&H operated in a 65,000-square-foot facility, with 150 employees, and petitioner, as president, earned an annual salary ranging from $276,040 to $1,318,813 during the years 1990 through 1993. Due to the changes in the industry, K&H sought labor-intensive work and advertised that it did material handling, scheduling, and quality control for different materials, including sheet metal fabrication and plastic forming and injection molding.

Other ways in which K&H was able to secure a larger portion of the market were to perform complete or "turn-key" projects and to assist its customers financially by purchasing the parts and providing financial float for customers while petitioner was performing its services. On occasion, K&H advanced cash and acted as a guarantor for third parties. In some of those instances, petitioner had an equity interest in the borrowing entity. K&H also "invested" time and expended capital in a project with a company known as PolyTracker, which was attempting to develop a locking shopping cart wheel. If successful, K&H

would have manufactured the wheel, and its profits might have permitted K&H to recoup its costs. The level of production necessary to permit K&H to recoup its costs was never achieved.

When K&H purchased materials to fulfill contracts with customers, to the extent that it had not been repaid and/or had not yet billed the customer, K&H either treated the outstanding amount as an asset or advance to the customer or, if it pertained to research and development, claimed it as an expense.

In one instance, K&H, at its own expense, built a dedicated facility for Apple Computer (Apple), and then recouped its capital outlay by means of a production contract with Apple. K&H built conveyance, assembly, and painting equipment, and purchased the enclosures that were delivered to K&H's facility where they were assembled, coated and/or painted, and then shipped to Apple. The sales of the product to Apple permitted the recoup of its capital outlay and also produced a 15-percent profit for K&H.

Hot Snacks, Inc. (Snacks), a C corporation, in January 1988, commenced a business with the goal of creating a computer-controlled vending machine that would dispense a french fried product, freshly fried in oil. One of K&H's employees brought the opportunity in Snacks to petitioner's attention. This opportunity was part of K&H's attempt to find new customers and a source for revenue. Petitioner invested $120,000 in Snacks at a time when a prototype of the computer-controlled vending machine

existed. As of July 1989, petitioner owned 88 percent of the outstanding shares of Snacks stock. Petitioner's accountant and the accountant's wife jointly invested $100,000 in exchange for 4 percent of Snacks stock. In addition to petitioner's and his accountant's stock ownership in Snacks, during 1990, new investors Donald Parker purchased 5 percent of Snacks stock for just over $150,000, and Al Marquez obtained 3 percent of Snacks stock with a value exceeding $100,000.

Petitioner and the accountant had begun their professional relationship during 1974. During 1993, although the accountant believed that Snacks would not be successful, he also believed that the vending machine patent could have residual value for future development and decided to pay petitioner $5,000 for petitioner's shares in Snacks. That sale caused petitioner to claim a $115,000 loss, $100,000 of which was claimed as an "ordinary" loss under section 1244.[3] This loss is not presently at issue before the Court.

Snacks entered into a relationship with K&H involving the development and manufacture of a vending machine. Expecting to be repaid, K&H incurred costs in attempting to develop a merchantable vending machine. Petitioner was designated as

---

[3] Section references are to the Internal Revenue Code as amended and in effect for the years under consideration. Rule references are to this Court's Rules of Practice and Procedure.

president of Snacks and was given authority to deal directly with K&H in accord with certain waivers that were made by Snacks' shareholders.  Snacks had also entered into joint venture agreements with Korean companies for certain aspects of the manufacture of the vending machines to be used in Southeast Asia.

K&H advanced cash to Snacks, and each such advance was formalized in a promissory note due 1 year from its date of execution.  The notes, signed by petitioner on behalf of Snacks, were dated from June 1988 through August 1993, and totaled $1,880,000.  Generally, the advances were used for Snacks' operating expenses.  The advances were carried on Snacks' and K&H's financial records and K&H's tax returns as loans or debt. K&H, on its Federal income tax returns, reported interest income from the notes.  A foreign company paid Snacks $600,000 for a license to sell the vending machine in a particular locality, and from that $300,000 was repaid to K&H during June 1990.  Other than the $300,000 repayment, no other repayments were made, and no attempt was made to collect the balance because Snacks was unprofitable.  K&H expected to earn income and profits from its relationship with Snacks by assembling vending machines.  It was estimated that K&H would make $500 per vending machine and that there would be a 100,000-unit market demand, resulting in

projected income of $50 million for K&H. K&H was not directly involved in the research and development of the vending machine.

K&H determined the amount of partial worthlessness of the advances made to Snacks each year by comparing the prior year's ending advance balance with Snacks' cumulative losses to arrive at a ratio. The resulting ratio was then applied to the prior year's ending advance balance to arrive at the claimed writeoff. Snacks' net worth as of July 31, 1990, 1991, 1992, 1993, and 1994 was a negative $1,244,172, $2,107,158, $2,571,348, $3,019,739, and $3,126,138, respectively, each caused by an excess of liabilities over assets. For its fiscal years ended April 27, 1991, and April 25, 1992, K&H claimed that the advances to Snacks had become partially worthless (a bad debt) and deducted the amounts of $579,607 and $461,970, respectively. Respondent, in the notice of deficiency, determined that the claimed bad debt deductions were not allowable.

K&H advanced Snacks more than $700,000 through April 1990 and additional amounts of $320,000 and $260,000 during the fiscal years ended April 1991 and 1992. For the period ended December 31, 1993, K&H, based on the accountant's advice, sold to the accountant $650,000 of the notes for $1,000 in an attempt to "fix the time and amount of the loss." Respondent determined that the

$649,000 ordinary loss deduction claimed by petitioner for 1993 was not allowable.

For its 1990, 1991, 1992, and 1993 fiscal years, K&H paid interest on indebtedness incurred to purchase a yacht in the amounts of $20,659, $20,280, $17,515, and $11,950, respectively.

OPINION

The principal and threshold question for our consideration is whether the advances from K&H to Snacks were debt or equity, thereby determining the proper deduction, if any, allowed to petitioner as sole shareholder of K&H, a pass-thru entity.  If we find that the advances are debt, we must consider whether the debt was business debt and became worthless as claimed.  In the setting of this case, the answer to the debt versus equity question will decide whether the claimed losses are ordinary or capital, if allowable.  Some of the factors that we consider here in deciding whether advances are debt or equity include:  The existence of debt instruments; the parties' intent and their representations of the advances; the existence of fixed maturity dates; rights to enforce payment; whether the advances enhanced participation in the debtor's management; the status of the advances relative to other creditors; whether the borrowing entity is thinly capitalized; repayment activity; and the type of expenditures made with the advances.  See, e.g., Dixie Dairies

Corp. v. Commissioner, 74 T.C. 476, 493-494 (1980); Cerand & Co. v. Commissioner, T.C. Memo. 1998-423; see also Estate of Mixon v. United States, 464 F.2d 394, 398 n.1 (5th Cir. 1972); A.R. Lantz Co. v. United States, 424 F.2d 1330 (9th Cir. 1970).

The facts and circumstances of each case must be considered, and no single factor is considered determinative. See John Kelly Co. v. Commissioner, 326 U.S. 521, 530 (1946). Ultimately, we must decide whether K&H intended to create a debt with a reasonable expectation of repayment and whether those aspects comported with economic reality. See Cerand & Co. v. Commissioner, supra. There can be no doubt that the form in which the advances were cast was debt and not equity. There is also no doubt that the parties treated the advances as debt. Each advance was memorialized by a promissory note, bearing a fixed rate of interest, and due 1 year from its execution. In addition, each of the parties to the notes recorded the accumulated balances as debts or loans on books and records and financial statements. It is also clear that, for tax purposes, each party consistently reported the advances as debt, and K&H reported interest income attributable to the notes.

In the face of petitioner's strong position on the form of the transactions, respondent contends that, in substance, the advances were equity in nature. In support of this contention,

respondent points out that only petitioner and no other shareholder signed the notes, and no efforts were made to collect matured notes. Petitioner counters that he was given authority and consent by the other shareholders. Petitioner also points out that the fact that petitioner signed all the notes does not link the advances to petitioner's capital investment in Snacks. Petitioner also explains that the failure to enforce collection on mature notes was not due to a legal inability, but instead to the knowledge that Snacks was not in a position to pay. In addition, petitioner points out that Snacks repaid K&H $300,000 when funds became available because of a transaction with a foreign licensee. That repayment, petitioner contends, is "clear evidence" of debt and not equity.

Respondent also argues that the advances were used to pay the day-to-day operating expenses in a setting where Snacks had not been shown capable of generating profit. This aspect, respondent contends, means that the repayment advances are placed at the "risk of the business", meaning, ostensibly, that the advances represent capital and not debt. Petitioner has shown otherwise. At the time petitioner paid $120,000 for share holdings in Snacks, a prototype of the vending machine existed. There was active development of the product and its marketplace throughout the period under consideration. After petitioner

invested in Snacks, foreign businesses became interested in the vending machine, and during 1990 other investors acquired several hundred thousand dollars of Snacks' stock representing substantially smaller percentages of the Snacks shares than those acquired by petitioner. In addition, Southeast Asian manufacturing companies entered into a joint venture agreement in connection with the vending machines' manufacture and sales in their geographical area. Those facts represent independent evidence of perceived potential for Snacks to be profitable. Accordingly, petitioner's belief as to the potential profitability of Snacks is confirmed by the actions of other lenders and business interests who became involved with Snacks on the same or similar terms as K&H and petitioner. These factors also bolster the estimates that there was potential for K&H to earn substantial profits (projected at 100,000 machines and profit of $500 per machine or $50 million).

The facts and circumstances in this case reflect that Snacks was not thinly capitalized and that the advances were in form and substance debt with a reasonable expectation of repayment. Accordingly, we hold respondent's determination, that the advances were equity, to be in error.

Next, we consider whether the loans to Snacks were business or nonbusiness as they related to K&H.[4]  Section 166, which permits deductions for bad debts, distinguishes between business and nonbusiness bad debts.  See sec. 166(d); sec. 1.166-5(b), Income Tax Regs.  A partial or wholly worthless business bad debt may be deducted, whereas only a wholly worthless nonbusiness bad debt is deductible.  See sec. 166.  To qualify as a business bad debt, it must be established that the debt was proximately related to the conduct of the taxpayer's trade or business.  See United States v. Generes, 405 U.S. 93, 103 (1972); sec. 1.166-5(b), Income Tax Regs.

Whether a debt is proximately related to a trade or business is dependent upon a taxpayer's dominant motive for lending the money.  See United States v. Generes, supra at 104.  A taxpayer's dominant motive must be business related, as opposed to investment related, for a loan to be proximately related to the taxpayer's trade or business.  See Putoma Corp. v. Commissioner, 66 T.C. 652, 673 (1976), affd. 601 F.2d 734 (5th Cir. 1979); United States v. Generes, supra.

Petitioner contends that the dominant motivation for the loans was developing business opportunities for K&H by

_____

[4]  We consider the business versus nonbusiness question next because petitioner, through K&H, seeks to claim losses due to partial worthlessness, a treatment that is not available for nonbusiness bad debts.  See sec. 166(d)(1)(B).

involvement in the manufacture of vending machines.  Conversely, respondent contends that the securing of future business was not the dominant motive.  Respondent argues that the potential for profit from the appreciation of Snack share holdings was the dominant motive for K&H advancing funds to Snacks.[5]  To some extent, we have tangentially addressed this question by holding that K&H's advances to Snacks were debt (loans) rather than equity.  In addressing the debt versus equity question, we have already decided that the advances were not equity and were not investment motivated.

Petitioner, who earned substantial salaries from K&H, realized that competition had forced his company to seek out additional business and provide incentives for potential or existing customers.  One of the ways that K&H accomplished this was to either advance money to or lessen the financial burden of customers.  Leading up to and during the years in issue, K&H lent funds, purchased inventory and provided float for customers, and built manufacturing facilities to address customers' needs.  The transaction with Snacks fit within that pattern of K&H's business activity.  There was business potential and reasonable expectation of profit for K&H in its relationship with Snacks.

---

[5]  We note that neither party makes distinctions between petitioner and his wholly owned S corporation.  For example, respondent connects petitioner's share ownership with his S corporation's advances.

That potential was corroborated by unrelated third parties.  We find that K&H's dominant motive for advancing or lending Snacks funds was for the purpose of developing business opportunities and that the debt was thus proximately related to its trade or business.  Accordingly, we hold that the advances in question were business bad debts within the meaning of section 166.

The final step in this three part inquiry is to decide whether petitioner has shown that any portion of the business bad debts became worthless during the years claimed by petitioner. This inquiry is also one of facts and circumstances, and worthlessness occurs "in the year in which identifiable events clearly mark the futility of any hope of further recovery". James A. Messer Co. v. Commissioner, 57 T.C. 848, 861 (1972).

Portions of the business bad debt were written off as partially worthless for the 1991 and 1992 fiscal years.  The amounts of partial worthlessness were computed by means of a ratio generated by comparing the total losses of Snacks to the outstanding balance of the advances (both of which were increasing annually).  Because the vending machines' capability depended on its computer hardware and software, the accountant considered the known propensity of these items to become technologically outmoded in choosing the method to compute worthlessness and in reaching the conclusion that loss deductions

should be claimed. Snacks had a negative net worth for its 1991 and 1992 years of $2,107,158 and $2,571,348, respectively. Snacks' negative net worth was steadily increasing throughout the period under consideration. The remaining $650,000 in outstanding notes was sold to the accountant, in a transaction for convenience, for $1,000 during the 1993 year. Also in 1993, petitioner sold his stock holdings in Snacks for $5,000 to the accountant and claimed a $100,000 capital loss deduction. At that time, petitioner owned about 80 percent of Snacks.

Respondent's focus with respect to the worthlessness question concerns the fact that K&H continued to make advances during the 1991 and 1992 period for which bad debt loss deductions were claimed. Relying on two memorandum opinions of this Court, respondent argues that continued extension of credit is not consistent with the claim of worthlessness. One of those opinions involved a taxpayer who was reselling a substantial percentage of its purchases to an insolvent customer. In that case, the holding that the taxpayer was not entitled to claim partial worthlessness was based on the fact that the customer was deeply insolvent and that its situation did "worsen markedly," and the taxpayer continued to sell a significant amount of merchandise (extend credit) to the customer. See Veego Foods, Inc. v. Commissioner, T.C. Memo. 1958-203. The other opinion

relied on by respondent involved a situation where the taxpayer claimed partial worthlessness where the debtor's liabilities were seven times its assets. The Court, in denying the taxpayer's claim, found: That although the liabilities exceeded assets by a ratio of 7 to 1, the assets had considerable value; in the year of the taxpayer's claim and the following year the debtor made repayments, and the repayments continued until the debt was reduced to an amount smaller than claimed loss. See Miller Realty Co. v. Commissioner, T.C. Memo. 1977-440.

In petitioner's circumstances, Snacks' negative net worth was steadily increasing. The increases during the 1991, 1992, and 1993 periods, however, were to some great extent attributable to advances from K&H. More importantly, petitioner has not shown any identifiable events that "clearly mark the futility of any hope of further recovery." The accountant's purchase of the notes for a nominal amount was a transaction for convenience and as a courtesy to petitioner, and did not evidence the worthlessness of the notes. We also agree with respondent's observation that K&H's continued extension of credit is not consistent with the claim of worthlessness. Although the advances are business debt within the meaning of section 166, no portion of them became worthless during petitioner's 1991, 1992, or 1993, taxable year. We also note that even if the sale of the

notes to the accountant for $1,000 evidenced the worthlessness of the notes, that sale did not occur until December 21, 1993, at the conclusion of K&H's 1993 year and, hence, petitioner's 1993 tax year.  In addition, petitioner's sale of his capital or equity interest in Snacks has not been shown to have had any particular effect on the worthlessness of the notes.  Accordingly, we find that petitioner has not substantiated his claim for partial worthlessness of the notes during the years in question.

Two remaining issues were addressed by the parties on brief.[6]  The first involved $60,143 of Snacks' operating expenses that were paid and claimed by K&H for its taxable year ended April 27, 1991.  Respondent determined in the notice of deficiency that the expenses "are not deductible because * * * [they] were incurred on behalf of * * * [Snacks] and therefore are not trade or business expenses of K&H".  On brief, respondent maintained the position that the expenses were not K&H's trade or business expenses.

Generally, one taxpayer may not deduct expenses paid on behalf of another taxpayer.  See, e.g., <u>Dietrick v. Commissioner</u>, 881 F.2d 336, 339 (6th Cir. 1989), affg. T.C. Memo. 1988-180.  We

_____

[6]  To the extent that either party did not address an issue raised by the pleadings, we assume that the issue has either been agreed to by the parties or is being abandoned by the party with the burden of proof.

have held that in certain limited circumstances a taxpayer may deduct the expenses of another taxpayer. See Lohrke v. Commissioner, 48 T.C. 679, 688 (1967). For the application of our holding in Lohrke, we must first ascertain K&H's motive for paying Snacks' operating expenses and then determine whether it was in furtherance or promotion of K&H's trade or business. See id.

Our consideration of whether the advances here were debt or equity and business or nonbusiness debts covered the question of whether the advances were to promote K&H or whether they were investment in Snacks. That is the same inquiry that is called for under the above-stated Lohrke standard. Because K&H's relationship with Snacks was to secure additional business and profits for K&H, it follows that K&H's payment of Snacks' operating expenses in this limited setting would be deductible by K&H. Accordingly, petitioner, through K&H, is entitled to the $60,143 deduction for his 1991 taxable year.

The final item addressed by the parties' briefs concerns respondent's disallowance of interest paid by K&H on indebtedness incurred to purchase a yacht. The amounts disallowed for petitioner's 1990 through 1993 taxable years are $20,659, $20,280, $17,515, and $11,950, respectively.

The record consists of only two exhibits that pertain to these adjustments.  One exhibit, a security agreement, reveals that during 1989, a used 1985 Carver boat was purchased, and $200,250 of the purchase price was financed.  Attached to the agreement is an amortization schedule showing a breakdown of the principal and interest to be paid.  The other exhibit is a December 1, 1994, memorandum from petitioner's accountant's office to respondent's agent.  The memorandum contains summarized information provided by the accountant pursuant to the request of respondent's agent.  The memorandum contains the following pertinent statements about the yacht:

> 7) Business purpose and expenses of Yacht - Per Ed Helwig, the boat (yacht is a misnomer as the vessel is 42 foot trailer-able boat) is used to entertain customers.  As the boat is not docked in a slip, but is parked at his house, there are no monthly expenses related to maintenance.
>
>     *       *       *       *       *       *       *
>
> Pursuant to Sec. 274 the boat is not depreciated for federal income tax purposes.  Any expenses related to the entertainment of customers on the boat are out-of-pocket costs reimbursed to E.A. Helwig by the corporation or corporate credit card charges, both of which are charged to the meals and entertainment accounts and limited to 80% deductible.  A "schedule of use" is not available.

Based on the above, respondent contends that no deduction is allowable for any expenditure paid with respect to an entertainment facility after December 31, 1978, pursuant to

section 274(a)(1)(B) and section 1.274-2(a)(2)(i), Income Tax Regs. Respondent further contends that pursuant to sec. 1.274-2(e)(4)(iii), Income Tax Regs., a yacht is considered an entertainment facility.

Petitioner, does not question respondent's contention, but instead counters that the interest deduction is allowable under section 274(f). That section, entitled "INTEREST, TAXES, CASUALTY LOSSES, ETC.," exempts from the section 274 requirements "any deduction allowable to the taxpayer without regard to its connection with his trade or business". With respect to corporations (taxpayers who are not individuals), section 274(f) is to be applied as though the taxpayer was an individual. In that regard, respondent argues that unless petitioner can show an exception to the general rule of section 163(h) that an individual's personal interest is not deductible, no deduction is permissible.

Petitioner simply argues that the language of section 163(h) "In the case of a taxpayer other than a corporation," no personal interest is allowable, would cause the allowance of an interest deduction because K&H is a corporation. If this were simply a matter of applying section 163(h), petitioner's argument would ring truer. The section 274 limitations outlined above, however, specifically address this situation. Those limitations cause

petitioner and/or his S corporation to be treated as an individual. Accordingly, petitioner is not entitled to deduct interest on the indebtedness to acquire the yacht under section 163(h), either in his own right or through his corporation.

To reflect the foregoing and because of concessions by the parties,

<u>Decision will be entered</u>

<u>under Rule 155.</u>